STATE of Wisconsin, Plaintiff-Respondent,†

v.

Alfred H. CAMACHO, Defendant-Appellant.††

Court of Appeals

*No. 91-0770-CR. Oral argument January 7, 1992.—Decided June 29, 1992.*

(Also reported in 487 N.W.2d 67.)

†Petition to review granted.
††Petition to cross review denied.

53

57

On behalf of the defendant-appellant, the cause was submitted on the briefs and oral argument of *Michael D. Dean* of *Aul, McKoy, Aschenbrener & Dean, Ltd.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general and *Sally L. Wellman,* assistant attorney general. Oral argument by *Sally L. Wellman.*

Before Nettesheim, P.J., Anderson and Snyder, JJ.

ANDERSON, J.   Among the issues Alfredo H. Camacho raises in this appeal is a challenge to the substantive jury instructions given by the trial court. We conclude that the trial court's substantive instructions seriously misstated the law of attempted first-degree murder and the lesser included crime of attempted manslaughter/imperfect self-defense, and constituted prejudicial error. Therefore, we reverse Camacho's conviction on the charge of attempted first-degree murder and remand for a new trial.[1]

Camacho admits that he shot Waukesha County Deputy Sheriff Richard Bach but claims he acted in self-defense. There is no material dispute about the events that led to the confrontation between Deputy Bach and Camacho on Interstate 94 in Waukesha county. Deputy Bach stopped Camacho on I–94 for a traffic violation. Camacho got out of his vehicle and walked back toward

---

[1]Because we are reversing the conviction and ordering a new trial, we are not required to consider Camacho's contentions that he was denied effective assistance of trial counsel, that the prosecutor engaged in misconduct, and that he is entitled to a new trial in the interest of justice.

the squad car. Because of a language problem, Deputy Bach did not understand Camacho and ordered him against the hood of the squad. When Camacho did not respond, Deputy Bach pushed him onto the hood of the squad and conducted a pat-down search. Deputy Bach then radioed for a back-up and told Camacho to return to his vehicle.

From this point, Deputy Bach's and Camacho's versions of the ensuing events diverge. Deputy Bach testified that he went to his squad and made a "wants and warrants" call and requested that a state trooper fluent in Spanish come to the scene. Deputy Bach then exited his squad and approached Camacho sideways so Camacho could not see that Deputy Bach had his hand on his gun. As Deputy Bach bent down to look into the window, Camacho turned and began to fire an automatic pistol. Deputy Bach heard four shots and was hit by three. He ran back to his squad and returned fire. Deputy Bach called for assistance and Camacho was arrested a short distance from the scene by another officer.

Camacho's testimony contradicted Deputy Bach's version of what happened and was consistent with his claim of self-defense. After the pat-down search, Camacho returned to his car. A short time later Deputy Bach approached the car with his hand on his gun. The deputy reached into the car and tried to pull Camacho out through the open window by pulling on his hair. Camacho, who was holding onto the steering wheel, was able to break free. He then heard a shot go off above his car. He became scared, grabbed his gun and loaded the action. Deputy Bach called him a "son of a bitch"; the deputy brought his revolver down, and Camacho ducked and fired out of the car window. Camacho lost sight of Deputy Bach and again ducked down; a number of shots

were fired into his car, and he drove off when the shooting stopped.

The trial court instructed the jury on attempted first-degree murder and the lesser included crime of attempted manslaughter/imperfect self-defense.[2] The jury convicted Camacho of attempted first-degree murder while armed with a dangerous weapon, secs. 940.01, 939.32 and 939.63(1)(a), Stats. (1987–88),[3] and he was sentenced to an indeterminate term of not more than twenty-five years.

Camacho filed a postconviction motion for a new trial under Rule 809.30, Stats., and sec. 974.02, Stats. The motion asserted that the trial court erred in failing to suppress precustodial and custodial statements made by Camacho and misstated the law in the substantive instructions given to the jury. In the alternative, Camacho maintained that if trial counsel had not properly preserved an objection to the jury instructions, he had been denied effective assistance of trial counsel. Camacho also claimed that the prosecutor engaged in misconduct in the closing argument and in deliberately misleading the trial court on the law of attempted manslaughter/imperfect self-defense during the confer-

---

[2]*State v. Seifert,* 155 Wis. 2d 53, 65, 454 N.W.2d 346, 351 (1990), recognizes the crime of attempted manslaughter/imperfect self-defense.

[3]All statutory references are to the 1987–88 statutes because the shooting of Deputy Bach happened on March 3, 1988. Wisconsin's new homicide law became effective on January 1, 1989. *See* secs. 472zkcn and 3203(57)(ag), 1987 Wis. Act 399. The new law did not make any substantive changes in the law of "imperfect self-defense," now known as "unnecessary defensive force." *See* Dickey, *The Importance of Clarity in the Law of Homicide: The Wisconsin Revision,* 1989 Wis. L. Rev. 1323, 1343.

ence on jury instructions. The trial court denied the motion for a new trial.

## I. JURY INSTRUCTIONS

Before addressing the accuracy of the jury instructions, we first consider whether Camacho's trial counsel properly objected to the proposed instructions. The state argues that the objection to the instructions was waived. The state concedes that trial counsel participated in extensive discussions on the jury instructions in unrecorded conferences. The state stresses that trial counsel did not register any specific complaints with the instruction on attempted manslaughter/imperfect self-defense after being given several opportunities to do so.

Camacho concedes that his trial counsel did not properly object to the erroneous instruction on the record. Camacho contends, however, that the "strenuous" objections voiced by counsel during the unrecorded conferences were sufficient to put the trial court on notice. In the alternative, Camacho asks us to consider the objection to the instructions raised by the postconviction motion for a new trial as sufficient preservation of his objection.[4]

The general rule requires that a party object to an improper jury instruction at the instruction conference or there is a waiver of the right to challenge the jury instructions on appeal. Section 805.13, Stats. There are no longer any judicially created exceptions to the waiver

[4]Camacho also requests that we order the record reopened and amended to reflect a specific objection being made before the delivery of the instructions to the jury. We need not comment on this request other than to point out that such a procedure would cause havoc at all levels of the judicial system.

rule. *See State v. Schumacher,* 144 Wis. 2d 388, 398–99, 424 N.W.2d 672, 676 (1988). However, under sec. 752.35, Stats., we have a broad discretionary power of reversal where we are satisfied that the real controversy has not been fully tried. *See Vollmer v. Lutey,* 156 Wis. 2d 1, 19, 456 N.W.2d 797, 805 (1990). In exercising this discretionary power of reversal it is not necessary to conclude that there is a probability of a different result on retrial. *Id.* We may use this discretionary power of reversal where there is a waiver of an error in the jury instructions. *Id.* at 20, 456 N.W.2d at 806.

Camacho did challenge the instruction in his motion for a new trial. He argued that the combined instruction on attempted first-degree murder and manslaughter/imperfect self-defense was erroneous. Camacho faults the trial court for omitting a critical portion of the jury instructions. He contends the jury should have been informed that the state must prove beyond a reasonable doubt that Camacho did not act with an *actual* belief that his use of force was necessary in self-defense before the jury could convict him of attempted first-degree murder. If the law of self-defense and manslaughter/imperfect self-defense requires such a finding before the jury can convict for attempted first-degree murder, and if the trial court did not include an explanation of this requirement in its instructions, then the real controversy may not have been fully tried. We conclude that Camacho's argument raises the specter of errors in the substantive jury instructions, and under our discretionary power of reversal we may consider the unobjected to jury instructions.

Camacho's chief issue on appeal challenges the substantive jury instructions.[5] A trial court has wide discretion in instructing the jury. *State v. Waalen,* 125 Wis. 2d 272, 274, 371 N.W.2d 401, 402 (Ct. App. 1985). The instructions chosen by the trial court must accurately and fairly state the law. *Id.*

■

Camacho argues prejudicial error in the jury instructions on attempted first-degree murder and the lesser included crime of manslaughter/imperfect self-defense, which omitted any reference to whether Camacho had an *actual* belief that the force used was necessary in self-defense. Case law compels the conclusion that the jury instructions misstated the law and constituted prejudicial error. Accordingly, we reverse on this ground.

This issue is governed by *State v. Harp,* 150 Wis. 2d 861, 443 N.W.2d 38 (Ct. App. 1989), and turns upon the distinction between *actual* belief and *reasonable* belief concerning the necessity of force used in self-defense. There, this court stated:

> To secure a conviction on first-degree or second-degree murder when perfect self-defense and manslaughter/imperfect self-defense are submitted to the jury, the state must prove beyond a reasonable doubt

[5]During the postconviction proceedings, the trial court volunteered that during the instructions conference it had concluded that the pattern jury instruction on attempted first-degree murder and attempted manslaughter/imperfect self-defense did not correctly state the law. On its own initiative the trial court rewrote the pattern instruction so that it would represent what the trial court believed to be a correct statement of the law. The trial court noted that it had guided both counsel in making changes to the pattern jury instruction.

(1) the existence of the statutory elements of first-degree or second-degree murder; and (2) that when the defendant caused the victim's death, the defendant did not *actually* believe that the force used was necessary in self-defense.

*Id.* at 885, 443 N.W.2d at 48 (emphasis added). The standard jury instruction in effect at the time, Wis J I—Criminal 1141 "First Degree Murder: Self-Defense Manslaughter," mirrored this requirement of an *actual* belief.[6] It stated in part:

Before you may find the defendant guilty of first degree murder, you must be satisfied beyond a reasonable doubt that he caused the death of (name of victim) with the intent to kill and that the defendant did not *actually believe* the force used was necessary in self-defense at the time he caused the death. When first degree murder is considered, the reasonableness of the defendant's belief is not an issue. You are to be concerned only with what the defendant *actually believed.*

*Id.* (emphasis added).

What both *Harp* and the former pattern jury instruction require is that, in order to convict on first-degree murder, the state must prove that the defendant had *no actual* belief that there was a necessity to use force in self-defense. *Harp* also dictates that the jury should be instructed that where the state fails to prove that the defendant lacked an *actual* belief that the force

---

[6]With the revision of Wisconsin's homicide law by 1987 Wis. Act 399, numerous jury instructions were withdrawn or otherwise replaced. Wis J I—Criminal 1141 was replaced with Wis J I—Criminal 1014, "First Degree Intentional Homicide: Self-Defense: Second Degree Intentional Homicide—Sec. 940.01(2)(b); Sec. 940.05."

used was necessary in self-defense, "the defendant must be acquitted of first-degree or second-degree murder." *Harp*, 150 Wis. 2d at 885, 443 N.W.2d at 48.[7] And as the pattern jury instruction trenchantly points out, when first-degree murder is considered, the reasonableness of the defendant's belief is not an issue.

The trial court here, however, tailored the standard "First Degree Murder: Self-Defense Manslaughter" instruction and, in so doing, infused it with the concept of *reasonable* belief.[8] The trial court's jury instruction

---

[7]The law of attempted first-degree murder is not conceptually different from that of completed first-degree murder. Both require an intent on the part of the defendant to take the life of another. In order to prove the crime of attempted first-degree murder, the state must establish that the defendant's actions would have caused the death of another except for the intervention of some extraneous factor. *State v. Dix,* 86 Wis. 2d 474, 482, 273 N.W.2d 250, 254, *cert. denied,* 444 U.S. 898 (1979). Therefore, the law of self-defense—perfect and imperfect—developed in the realm of first-degree murder also is applicable in the realm of attempted first-degree murder.

[8]We recognize a trial court has wide discretion in the development of jury instructions both as to the choice of language and the emphasis used, *State v. Waalen,* 125 Wis. 2d 272, 274, 371 N.W.2d 401, 402 (Ct. App. 1985), and that the instructions given do not have to be in conformity with the pattern jury instructions. *Carlson v. Drews of Hales Corners, Inc.,* 48 Wis. 2d 408, 414, 180 N.W.2d 546, 549 (1970). However, the work of the Criminal Jury Instructions Committee is viewed as persuasive, and it is generally recommended that trial courts use the pattern instructions because they represent a painstaking effort to accurately state the law and afford statewide uniformity. *See State v. Kanzelberger,* 28 Wis. 2d 652, 659, 137 N.W.2d 419, 422–23 (1965), *cert. denied,* 385 U.S. 867 (1966). Of course, the pattern instructions are not infallible and when it is necessary for a trial court to deviate from the suggested language in the pattern instructions, it must fully and fairly state the law. *See McMahon*

read in part as follows:

> As applied to this case, the effect of the law of self-defense is that if the defendant attempted to cause the death of Deputy Richard Bach with the intent to kill, but the defendant's conduct was not in self-defense or the defendant was not entitled to use self-defense *and the belief by the defendant that he was entitled to use self-defense was unreasonable,* then the defendant is guilty of the crime of attempted first degree murder. [Emphasis added.]

By its terms, the given jury instruction allowed the jury to convict Camacho of attempted first-degree murder upon finding that his belief in the necessity for self-defense was unreasonable. But, as *Harp* instructs, "[i]f defendant's actual belief was unreasonable, then the defense of manslaughter/imperfect self-defense has been established, and defendant must be acquitted of first-degree or second-degree murder." *Harp,* 150 Wis. 2d at 885–86, 443 N.W.2d at 48. The instruction as given was therefore erroneous.

The state does not squarely address the issue of actual versus reasonable belief in its appellate brief. Rather, it fashions an argument from the language of the self-defense statute, sec. 939.48(1), Stats., which stated in part:

> A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by such other person.

*v. Brown,* 125 Wis. 2d 351, 354, 371 N.W.2d 414, 416 (Ct. App. 1985).

In essence, the state argues that the references to *"reasonable* belief" in the given jury instructions refer to a belief in an unlawful interference rather than to a belief in the necessity of the use of force against such an interference.

The state's contention notwithstanding, *Harp* makes clear that the jury should be instructed that, if the state fails to prove that the defendant lacked an *actual* belief that the force used was necessary in self-defense, then it must acquit the defendant of attempted first-degree murder. *Harp,* 150 Wis. 2d at 885, 443 N.W.2d at 48. We are unconvinced that the given jury instructions did this adequately, if at all. Jury instructions are reviewed in their entirety, and if error is rendered harmless because of other correct statements of the law in the instructions, we will not reverse. *See Larson,* 86 Wis. 2d at 197, 271 N.W.2d at 651. We cannot conclude, however, that the remainder of the jury instructions rendered harmless this significant error.[9]

Alternatively, the state argues that even if the instructions were incorrect, they were harmless because Camacho has failed to prove that, but for the error, there is a reasonable probability that he would not have been convicted of attempted first-degree murder. Again, we cannot agree. The state argues that "[t]he only basis for the jury to return a verdict of imperfect self-defense in

_____

[9]We further note that the trial court's jury instructions frequently use the phrase "entitled to believe" in contexts which, under *State v. Harp,* 150 Wis. 2d 861, 443 N.W.2d 38 (Ct. App. 1989), would properly require a reference to an *actual* belief. We are convinced that in the context of the rewritten instructions in this case, "entitled to believe" is synonymous with "reasonably believed."

this case was if they [sic] believed the defendant's story, but they [sic] believed the actual force he used to defend against the officer's attack was unreasonable under the circumstances."

The jury, as instructed, was allowed to find Camacho guilty of attempted first-degree murder on the strength of a legal standard reserved for manslaughter. We cannot say with any confidence that the jury, if properly instructed, might not have found Camacho to have an *actual* but *unreasonable* belief in the necessity of using force in self-defense. We therefore reject the state's harmless error argument.

## II. STATEMENTS

Although we reverse and remand for a new trial, we will consider Camacho's contention that the trial court erred in admitting statements he made to police officers after the shooting because it is highly probable that the same issues will arise in a new trial.

Camacho argues that the trial court failed to suppress certain statements made by him while in custody. The first statement was given at the scene of his arrest immediately after he was restrained and taken into custody. Two other statements were given at the station house. The first of these was volunteered after Camacho was advised of his *Miranda* rights. The second was actually a series of inculpatory statements given by Camacho after he invoked his right to counsel. We will address each separately.

Questions of law and constitutional fact are subject to independent appellate review but the latter also requires an independent application of the constitutional principles involved to the facts as found by the trial

69

court. *State v. Lee,* 122 Wis. 2d 266, 274, 362 N.W.2d 149, 152 (1985).

## A. ON-THE-SCENE STATEMENT

Camacho gave a statement at the scene of his arrest concerning the location of his gun before arresting officers read him his rights as required by *Miranda v. Arizona,* 384 U.S. 436 (1966). The circuit court refused to suppress this statement finding that the "public safety" exception to *Miranda* applied. The state used this statement during its case-in-chief.

Camacho argues that the statement was inadmissible because he gave it involuntarily, citing *Mincey v. Arizona,* 437 U.S. 385, 397–98 (1978). The voluntariness of a statement is determined by the totality of circumstances weighing the personal characteristics of the defendant against several factors including:

(1) the age of the suspect;

(2) the suspect's education and intelligence;

(3) the suspect's physical and emotional condition;

(4) whether the suspect has had prior experience with the police;

(5) whether the suspect was apprised of his rights;

(6) whether the suspect requested counsel and the response to any such request;

(7) the length and condition of the interrogation; and

(8) any physical or psychological pressures, inducements, methods or stratagems used by the police to obtain the incriminating statement or confession from the suspect.

70

*See State v. Shaffer,* 96 Wis. 2d 531, 542–43, 292 N.W.2d 370, 376 (Ct. App. 1980).

Camacho was an adult with a secondary education. He had past contacts with area police and, except for the usual restraint associated with arrest, was not subjected to any physical or psychological pressures to provide a statement. Before giving Camacho *Miranda* warnings, the police asked him one question which he answered. Failure to provide *Miranda* warnings does not automatically render a confession involuntary. *See Miranda,* 384 U.S. at 457. Consequently, Camacho furnished the statement voluntarily.

In the alternative, Camacho contends that the police did not obtain the statement within the public safety exception to *Miranda* that was recognized in *New York v. Quarles,* 467 U.S. 649 (1984); therefore, the state improperly used it during its case-in-chief.

We have recognized two limited safety exceptions to *Miranda:* the public safety exception and the "rescue doctrine," also known as the private safety exception. *State v. Kunkel,* 137 Wis. 2d 172, 184–89, 404 N.W.2d 69, 74–76 (Ct. App.), *cert. denied,* 484 U.S. 929 (1987). Both exceptions are based on the concept that the police need not choose between losing the opportunity to either protect the public or to save the life of one individual and losing the right to obtain evidence from a suspect in custody. *Id.* at 189, 404 N.W.2d at 76.

In *Kunkel* we found the rationale of the Supreme Court in *Quarles* to be persuasive. The *Quarles* Court had explained that:

> [t]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth

Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft [the arresting officer] in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Quarles,* 467 U.S. at 657–58. The exception does not depend on the inquiring officers' motivations as long as the questions asked are reasonably prompted by a concern for public safety. *Id.* at 656.

Camacho argues that the public safety exception does not apply because the public was not in danger since the police had secured the highway with roadblocks and there was no actual or expected civilian pedestrian traffic. This contention is untenable because the *Quarles* exception applies to the safety of both the public and the police actually involved in the arrest of armed persons. *See, e.g., United States v. Edwards,* 885 F.2d 377, 384 (7th Cir. 1989).

Camacho next argues that the public safety exception does not apply because he:

> was prone and hand-cuffed with three officers on top of him conducting a body search. There was no shouting. There were four to five squad cars and numerous officers at the scene. Other officers were arriving.

Several opinions illustrate that the public safety exception is not rendered inapplicable simply because several

officers are present during the arrest of a suspect or because officers handcuff an arrestee. *See, e.g., Quarles,* 467 U.S. at 652. In addition, the only information known by Camacho's arresting officers was that one of their colleagues had been shot. During the tension of the arrest, asking Camacho "Where's the gun" was a reasonable inquiry falling squarely within the *Quarles* exception. Therefore, the trial court did not err in allowing the state to introduce during its case-in-chief Camacho's on-the-scene statement concerning the location of his gun.

## B. POST-*Miranda* STATEMENT

At the station house, Camacho stated, "I know I did wrong," after authorities had advised him of his *Miranda* rights. The circuit court admitted this statement after finding that Camacho had not properly invoked his right to counsel. The state used this inculpatory statement during its case-in-chief.

Camacho first argues that the trial court should have suppressed this statement. According to Camacho, the state used leading questions during the suppression hearing to establish the timing of his invocation of the right to silence and counsel. However, Camacho never objected to the form of the state's questions; thus, his protestations are waived. *Bennett v. State,* 54 Wis. 2d 727, 735, 196 N.W.2d 704, 708 (1972).

Camacho next contends he uttered the statement after he invoked his right to counsel. Police must terminate an interrogation of a suspect in custody if the suspect requests assistance of counsel. *Miranda,* 384 U.S. at 473–74. Camacho's argument cannot prevail because the trial court made specific findings of fact that Camacho

gave this statement before he invoked his right to silence and counsel. These findings are not clearly erroneous. *See State v. Woods,* 117 Wis. 2d 701, 715, 345 N.W.2d 457, 465 (1984).

Camacho next suggests that the trial court erred because the statement was "part and parcel of his [Camacho's] invocation of Fifth and Sixth Amendment rights." It is beyond credulity to conclude that the statement, "I know I did wrong," was part of Camacho's request for counsel; thus, Camacho's suggestion of anything to the contrary must be rejected.

Finally, Camacho argues he gave the statement involuntarily. The *Shaffer* voluntariness factors also apply in the analysis of this statement and thus lend support to the conclusion that Camacho provided the statement voluntarily. In addition, police had given Camacho his *Miranda* warnings, Camacho had not yet invoked his right to counsel, and the police did not elicit the statement after a lengthy interrogation. Because there is no evidence of coercion on the part of Camacho's arresting officers, nor of involuntariness by Camacho in giving the statement, Camacho's argument that he gave the statement involuntarily also fails. We conclude that the trial court did not err in admitting Camacho's statement, "I know I did wrong."

## C. Postinvocation-of-Counsel Statement

Camacho's final inculpatory statement was a series of statements elicited from him while in custody, after he had invoked his right to counsel, following the reading of his *Miranda* rights. The circuit court held that these statements were voluntary and had not been taken

in violation of *Miranda*. The state used these statements solely for impeachment purposes.

A suspect who invokes his fifth amendment right to counsel is not subject to further custodial interrogation until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with police. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Camacho contends he did not reinitiate the interrogation that elicited the series of statements. However, the resolution of this issue is moot because it would establish only that Camacho's interrogators obtained the series of statements in violation of *Miranda*. Such statements are barred from use only during direct examination. *See Ameen v. State*, 51 Wis. 2d 175, 179–81, 186 N.W.2d 206, 209–10 (1971).

Camacho also argues that he gave the final series of statements involuntarily. Camacho points to several facts that are relevant to the now familiar *Shaffer* voluntariness analysis: First, Camacho requested a lawyer, yet the police continued to question him. However, we hold that a statement is not presumed compelled simply because interrogators may have taken it in violation of *Miranda*. *Quarles*, 467 U.S. at 655 n.5. Second, there was substantial delay in contacting an attorney for Camacho. It is established that, "[f]acts about which the defendant has no knowledge can hardly exert any degree of coercion on him." *State v. Hanson*, 136 Wis. 2d 195, 215, 401 N.W.2d 771, 779 (1987). Third, he points to what he characterizes as some evidence of psychological pressures and inducements employed by the police. Specifically, they gave him coffee and cigarettes, they removed his handcuffs, they told him that they would believe him until given a reason not to, and they suggested that he was an illegal alien. We conclude that

these efforts do not constitute impermissible psychological coercion. Finally, Camacho argues that he had gone the whole night without sleep and had some minor injuries. However, nothing in the record suggests that Camacho's physical or emotional condition was so grave that he was not aware of what he was saying or doing.

In addition to rejecting the above arguments of Camacho, we also note that Camacho's age, education and experience with police suggest that Camacho gave the final series of statements voluntarily. Furthermore, the police had advised Camacho of his rights and the actual interrogation only lasted about an hour and one-half. Thus, based on the totality of the circumstances, *see Shaffer,* 96 Wis. 2d at 542, 292 N.W.2d at 376, we conclude that Camacho gave the final series of statements voluntarily and that the trial court did not err in refusing to suppress these statements.

*By the Court.*—Judgment and order reversed and cause remanded with directions.