THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK LALIBERTE, Defendant-Appellant.
Second District   No. 2—91—1040

Opinion filed June 16, 1993.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Sherry R. Silvern, of Aurora, for appellant.

162

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

Defendant, Mark A. Laliberte, was charged on June 8, 1990, with aggravated kidnaping. (Ill. Rev. Stat. 1989, ch. 38, pars. 10—1(a)(1), 10—2(a)(1).) Following a jury trial in the circuit court of Winnebago County, defendant was found guilty and sentenced to 30 years in prison. Defendant appeals both the conviction and the sentence.

Defendant contends on appeal: (1) defendant's statements to police regarding the whereabouts of the kidnaping victim should have been suppressed; (2) tape recordings of conversations between defendant and the victim's father should have been suppressed; and (3) the trial court's sentence of 30 years' imprisonment was an abuse of discretion. The State contests defendant's assertions and further contends that regardless of this court's disposition of defendant's two suppression claims, the conviction should be affirmed due to the "overwhelming" nature of the evidence against defendant. We affirm.

On June 7, 1990, at approximately 9:50 a.m., defendant rang the doorbell at 1625 Shiloh Road in Rockford, Illinois, the residence of Dr. David Bartels. Home at the time were the Bartelses' baby-sitter and their two children, Bradley Bartels, age seven years, and Douglas Bartels, age one year.

Bradley answered the bell. Defendant stood in the front door, holding a bouquet of flowers and a gun. When the baby-sitter came up the basement stairs with Douglas in her arms, the defendant ordered her and Bradley back downstairs. All four went to the basement, where the baby-sitter was handcuffed to a pole, Bradley to a laundry basin. Defendant then took one-year-old Douglas. He asked for Dr. Bartels' office phone number, rummaged around upstairs until he found it, and left with the baby. Bradley was able to get free and telephoned the police.

Defendant drove the baby in a rented van to a wooded area in the northwest part of Rockford. There he zipped Douglas into a nylon duffel bag and left him in the woods.

Defendant telephoned Dr. Bartels in his office at about 10:15 a.m. and told him he had kidnaped his son. A few moments later, defendant called again and demanded $100,000 in return for the child. He told Dr. Bartels that he would call back at 5 p.m. Defendant returned

the van to the rental agency around noon and later visited a hair salon, where he had his hair cut and highlighted.

Defendant called Dr. Bartels' home at 12:50 p.m. and 5:58 p.m. Those calls were electronically recorded by the FBI with Dr. Bartels' consent.

Learning that Dr. Bartels had accumulated the money, defendant directed him to three locations to wait for phone calls. Eventually, defendant told Dr. Bartels to leave the money at a mailbox on an island in a shopping center. When Dr. Bartels asked to see Douglas before handing over the money, defendant said that it would not be possible since the baby was out in the woods.

Observed by an FBI surveillance team, defendant picked up the money while on his motorcycle. He led officers on a high-speed chase before he was bumped from his motorcycle by an FBI squad car.

On the ground, surrounded by officers, defendant responded to police demands to reveal the location of the child by saying, "Fuck you, I want a lawyer." He was handcuffed and placed in a squad car with FBI agent Gary Fuhr. According to defendant, he requested an attorney repeatedly during the ensuing interrogation. After approximately 40 minutes of intense questioning by Fuhr, defendant agreed to direct the police to the woods where he left Douglas that morning. He also revealed that he had worked alone and that he had placed the baby in a duffel bag. Douglas was found alive, lying outside the duffel bag, at about 9:30 p.m.

Later that evening, at the Winnebago County Public Safety Building, defendant signed a written waiver of his *Miranda* rights and gave Winnebago County sheriff's police a detailed statement of the planning and execution of the kidnaping.

Defendant filed a motion to suppress all statements made to police from the moment of his apprehension. The motion was denied following a hearing. Defendant received a jury trial. A motion to suppress the tape-recorded telephone conversations with Dr. Bartels was argued and denied. Defendant's statements made to Agent Fuhr in the backseat of the squad car and the taped telephone conversations were introduced into evidence at trial. The State did not introduce defendant's later statement given to officers at the Public Safety Building.

Defendant was convicted of aggravated kidnaping for ransom and sentenced to 30 years' imprisonment. Motions for a new trial and for reconsideration of the sentence were denied.

Defendant asserts on appeal that his statements to Agent Fuhr in the squad car were improperly admitted into evidence. Defendant

claims that, by ignoring his demands to see a lawyer and by continuing to question him about the whereabouts of the child, Agent Fuhr violated his fifth amendment protection against self-incrimination. The State urges us to consider the exigent circumstances under which the police were operating and to apply a public safety exception to defendant's privilege against self-incrimination.

The issue of whether a suspect's invocation of his right to counsel in an emergency situation need result in the suppression of evidence requires our careful consideration. Fundamental questions arise involving the interpretation of the privilege against compelled self-incrimination as provided for by article I, section 10, of the Illinois Constitution (Ill. Const. 1970, art. I, §10) and the fifth amendment of the United States Constitution (U.S. Const., amend. V).

We are persuaded from our review of Federal constitutional jurisprudence that the fifth amendment's privilege against compelled self-incrimination provides no constitutional right to counsel independent of the procedural protections of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. A State case that may directly bear on a question of whether article I, section 10, of the Illinois Constitution provides a State constitutional right to counsel is currently pending in the Illinois Supreme Court. While nevertheless recognizing the validity of certain exceptions to the *Miranda* rule, specifically the public safety or "rescue doctrine" exceptions, we hesitate to adopt and apply such an exception where, as here, a suspect in custody immediately and unambiguously demands an attorney. Therefore, we conclude, based on current Illinois law, that the trial court erred in denying defendant's motion to suppress his statements made to Agent Fuhr in the backseat of the squad car. However, we hold that the error is harmless, given the overwhelming nature of the remainder of the evidence against defendant, and affirm the conviction.

The right to counsel is associated with two amendments to the United States Constitution. The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel." (U.S. Const., amend. VI.) The right to counsel under the sixth amendment attaches only when "judicial proceedings have been initiated against [the criminal defendant]— 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " (*Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1239, quoting *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882.) A right to counsel is associated with the fifth amendment through the procedural safeguards provided by *Miranda*. Because, in

the case before us, defendant was not charged with any crime at the time of his initial interrogation, any right to counsel must be analyzed under the fifth amendment.

The fifth amendment to the United States Constitution guarantees that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." (U.S. Const., amend. V.) In *Miranda*, the United States Supreme Court extended the fifth amendment privilege against self-incrimination to custodial interrogation.

Among other things, a suspect in a custodial interrogation setting must be warned that he has the right to counsel, either retained or appointed, during questioning. (*Miranda*, 384 U.S. at 479, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.) The *Miranda* Court explained that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." (*Miranda*, 384 U.S. at 469, 16 L. Ed. 2d at 721, 86 S. Ct. at 1625.) The primary purpose of counsel is to act as a "protective device[ ] *** to dispel the compulsion inherent in custodial surroundings." *Miranda*, 384 U.S. at 458, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.

The fifth amendment right to counsel attaches only after the defendant's invocation. (*Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28.) If a suspect invokes his right to counsel in response to *Miranda* warnings, all interrogation must cease until an attorney is present. (*Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1628; see also *Minnick v. Mississippi* (1990), 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486.) The Court in *Miranda* thus "fashioned *** the rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights." *Fare v. Michael C.* (1979), 442 U.S. 707, 719, 61 L. Ed. 2d 197, 209, 99 S. Ct. 2560, 2569.

Under *Miranda*, any statement taken from a suspect without the presence of an attorney is inadmissible in the prosecution's case in chief unless the prosecution demonstrates that the defendant was given *Miranda* warnings and made a knowing and intelligent waiver of his privilege against self-incrimination. (*Miranda*, 384 U.S. at 475-77, 16 L. Ed. 2d at 724-25, 86 S. Ct. at 1628-29.) In *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, the Court went a step further, holding that once an accused has expressed his desire to deal with the police only through counsel, the State must establish both that it was the accused who initiated further discussions with the police and that he knowingly and intelligently waived the right he had invoked. *Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85.

This *Miranda* "exclusionary rule" is intended to safeguard a suspect's rights under the fifth amendment and applies even if the defendant's constitutional rights under the fifth amendment were not violated. (See *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285.) The supreme court has explained that the fifth amendment bars only the use of statements which are compelled and that the *Miranda* exclusionary rule extends further than the fifth amendment's protection against involuntary statements. *(People v. Winsett* (1992), 153 Ill. 2d 335, 352.) *Miranda* bars the prosecution from using a statement taken in violation of *Miranda* rules in its case in chief, even if that statement was not compelled within the meaning of the fifth amendment. See *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285.

The Court has drawn a distinction between police conduct that infringes directly upon an accused's constitutional rights and conduct that violates only the prophylactic rules developed to protect those rights. *(Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357; *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285.) The "fruit" of a statement obtained in violation of a constitutional right, such as the fourth amendment right against unlawful search and seizure, must be suppressed *(Wong Son v. United States* (1963), 371 U.S. 471, 484-85, 9 L. Ed. 2d 441, 453, 83 S. Ct. 407, 415-16), but the "fruit" of a statement obtained in violation of a prophylactic rule is not automatically subject to exclusion *(Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357; *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285). Thus, where the police violate the prophylactic rules developed in *Miranda*, but do not actually violate the defendant's fifth amendment privilege against self-incrimination, the fruit of the poisonous tree doctrine will not be applied to exclude physical or testimonial evidence derived from the defendant's statements.

The fifth amendment prohibits only the use of compelled or involuntary statements. *Miranda* and its progeny create an irrebutable presumption that the defendant's statement is compelled whenever the police question an unrepresented defendant, after that defendant invokes his right to counsel. *(Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28; see *Fare v. Michael C.* (1979), 442 U.S. 707, 718, 61 L. Ed. 2d 197, 208, 99 S. Ct. 2560, 2568.) There are exceptions to the presumption of irrebutability. A suspect not in custody is, of course, not covered by *Miranda*. The Court has also held that *Miranda* violations do not preclude the use of elicited statements for impeachment purposes, provided that the statements are not oth-

erwise involuntary. (*Harris v. New York* (1971), 401 U.S. 222, 224-25, 28 L. Ed. 2d 1, 4, 91 S. Ct. 643, 645.) Similarly, noncoerced statements are admissible under the public safety exception established in *New York v. Quarles* (1984), 467 U.S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626, which we discuss below.

■ In general, then, *Miranda* rights are triggered by custodial interrogation. (*Miranda v. Arizona* (1966), 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 706-07, 86 S. Ct. 1602, 1612-13.) Statements made during a custodial interrogation cannot be admitted into evidence unless the suspect is given the *Miranda* warning and intelligently waives the right against self-incrimination. If an accused invokes the right to counsel, he is not subject to further interrogation until counsel is made available, unless he validly waives the earlier request for counsel. *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884-85.

However, the United States Supreme Court has enunciated limited exceptions to the *Miranda* requirement. (*New York v. Quarles* (1984), 467 U.S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626.) Thus, police faced with an immediate threat to public safety may ask questions necessary to secure the safety of the public or themselves prior to issuing a *Miranda* warning. (*Quarles*, 467 U.S. at 655-57, 81 L. Ed. 2d at 556-58, 104 S. Ct. at 2631-32.) In the case before us, the State urges us to apply the *Quarles* public safety exception.

In *Quarles*, police officers chased a suspected rapist who was armed with a gun through a grocery store. When the officers apprehended the man, he did not have a gun. An officer frisked the man, found an empty shoulder holster, and asked him where the gun was. On the basis of his answer, the police retrieved the gun from a carton nearby, then arrested the man and read him the *Miranda* warning. (*Quarles*, 467 U.S. at 651-52, 81 L. Ed. 2d at 554-55, 104 S. Ct. at 2628-29.) The *Quarles* Court reasoned that requiring the police to read the *Miranda* warning before the gun was discovered might have deterred the man from responding and put the public safety at risk. (*Quarles*, 467 U.S. at 656, 81 L. Ed. at 557, 104 S. Ct. at 2631.) "[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Quarles*, 467 U.S. at 657, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632.

We agree with the State that the facts in the case before us are, if anything, even more compelling than those in *Quarles*. A baby was taken from his parents' home by an armed abductor. The kidnaper threatened violence on the phone: "[y]ou better tell [the police] to get

the hell out of there or you'll never see your son again." Police knew that as of 6 p.m. Douglas had not been fed or changed. Some two hours later they learned that he was "in the woods." When they took the defendant into custody, it was growing dark and beginning to rain.

The State concedes that defendant, handcuffed in the backseat of the squad car, was in custody during Agent Fuhr's questioning. Defendant's invocation of the right to counsel was unambiguous. His statements to Agent Fuhr admitting knowledge of the kidnaping and of the victim's whereabouts were incriminating. The trial court framed the controlling issue as whether "the life at stake here overrides the rights at stake." The trial court determined that the exigency of saving Douglas' life took precedence over defendant's right to remain silent. Citing the *Quarles* public safety exception, the trial court denied defendant's motion to suppress the incriminating statements.

Before ruling on the written order, the trial court appeared to vacillate between two rationales: the public safety exception of *Quarles*, on the one hand, and a "private safety exception" or "rescue doctrine," on the other. The confusion is understandable, as both theories apply to emergency situations involving the public safety and are, at bottom, almost interchangeable.

■ Both the public safety exception and the "rescue doctrine/private safety exception" are based upon the concept that police need not choose between losing the opportunity either to protect the public or to save the life of one individual and losing the right to obtain evidence from a suspect in custody. (*Quarles*, 467 U.S. at 657-58, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632; *Wisconsin v. Camacho* (1992), 170 Wis. 2d 53, 71, 487 N.W.2d 67, 75.) The *Quarles* Court weighed the danger to the public against the cost of losing evidence. Application of the "private safety exception" or "rescue doctrine" weighs the possible imminent loss of a known person's life against that cost.

The public safety exception has been acknowledged by this court but never applied. (See, *e.g., People v. Nau* (1988), 167 Ill. App. 3d 338 (where a motion to suppress statements was allowed, the State waived the public safety exception argument by not raising it below); *People v. Roundtree* (1985), 135 Ill. App. 3d 1075 (where there was no threat to the public safety in fact and none perceived by the officer who secured control of the scene, the public safety exception had no application).) The "private safety exception" or "rescue doctrine" has been neither recognized nor applied in Illinois.

The State believes that a safety exception, however labelled, should apply to the facts before us, asserting that the *Quarles* decision, forged to protect the public, must extend equally to known individuals and the public at large. We agree in principle with the analysis of the State and the trial court but decline at this time to establish new precedent for the reasons stated below.

Several States have recognized a "private safety exception" or "rescue doctrine." (See, *e.g.*, *People v. Willis* (1980), 104 Cal. App. 3d 433, 163 Cal. Rptr. 718; *State v. Provost* (Minn. 1992), 490 N.W.2d 93; *State v. Kunkel* (1987), 137 Wis. 2d 172, 404 N.W.2d 69, *cert. denied* (1987), 484 U.S. 929, 98 L. Ed. 2d 256, 108 S. Ct. 297.) Faced with similar facts, the Wisconsin Court of Appeals adopted the "rescue doctrine" as a limited "companion" exception to the public safety exception. (*State v. Kunkel* (1987), 137 Wis. 2d 172, 404 N.W.2d 69.) In *Kunkel*, a nine-month-old infant was reported missing. Police took the baby's father into custody and read him the *Miranda* warning. The father invoked his right to counsel by saying that he was unemployed and could not afford a lawyer. Nevertheless, the police proceeded to question him about the whereabouts of his child. Eventually, he led the police to the infant's grave. *Kunkel*, 137 Wis. 2d at 178-80, 404 N.W.2d at 71-72.

The *Kunkel* court applied the "rescue doctrine" as developed in California. A California court set out the elements of an emergency sufficient to excuse the *Miranda* requirements: "1. [u]rgency of need in that no other course of action promises relief; 2. [t]he possibility of saving human life by rescuing a person whose life is in danger; 3. [r]escue as the primary purpose and motive of the interrogators." *People v. Riddle* (1978), 83 Cal. App. 3d 563, 576, 148 Cal. Rptr. 170, 177, *cert. denied* (1979), 440 U.S. 937, 59 L. Ed. 2d 496, 99 S. Ct. 1283.

The *Kunkel* court found that the trial court's factual findings fulfilled the elements of the "rescue doctrine." Urgency of need existed because the child, missing since morning, was nine months old, and police conversations with his father did not occur until after midnight. Because the father, who was in charge of the infant that day, was the only source for the information the police sought, interrogation was the only course of action promising relief. Obtaining information from the father regarding the whereabouts of the child created the possibility of saving a human life. The court found that the police perceived the existence of a genuine emergency and a concern that the child might be alive and in need of assistance. *Kunkel*, 137 Wis. 2d at 184, 404 N.W.2d at 75.

Applying a similar analysis, the facts before us appear to satisfy the three elements of the "rescue doctrine." Douglas was one year old and had been missing for nearly 11 hours. Urgency of need existed. Defendant was the only source for the information the police sought, making interrogation the only course of action promising relief. Information from defendant might save Douglas' life. Agent Fuhr testified to the urgency of his concern for Douglas' safety. He further testified that his questions regarding how long Douglas had been in the woods were designed to determine whether a medical team should be alerted. Similarly, questions about possible accomplices sprang from his concern for the safety of the search party.

Once the information necessary to finding Douglas was obtained, the officers ceased all questioning of the defendant. The threat to Douglas' life was neutralized, and the basis for an exception no longer existed. The *Quarles* Court posited that "in each case [the public safety exception] will be circumscribed by the exigency which justifies it." (*Quarles*, 467 U.S. at 658, 81 L. Ed. 2d at 559, 104 S. Ct. at 2633.) Questioning resumed only after the defendant had given a written waiver of his *Miranda* rights at the Winnebago County Public Safety Building.

The "rescue doctrine" is more limited than the public safety exception in that it specifies an interrogator's purpose and motivation. Questioning must be driven by the desire to rescue. The *Quarles* Court did not place strictures on the subjective motivation of the questioner: "the availability of [the public safety] exception does not depend upon the motivation of the individual officers involved." (*Quarles*, 467 U.S. at 656, 81 L. Ed. 2d at 557, 104 S. Ct. at 2631.) The case at hand conforms to both the public safety exception and the more limiting requirement of the "rescue doctrine."

*Kunkel*, of course, is not binding on this court. However, we are persuaded by the *Kunkel* decision that the companion to the public safety exception must be a private safety exception, whether labelled as such or as a "rescue doctrine." (*Kunkel*, 137 Wis. 2d at 189, 404 N.W.2d at 76.) The *Quarles* Court only theorized about the risk a missing gun might present to the public, suggesting that an accomplice might make use of it or that, later, a customer or an employee might come upon it. (*Quarles*, 467 U.S. at 657, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632.) The danger in the present case was less hypothetical. A specific member of the public was in immediate danger of losing his life.

"If on the facts before it, the *Quarles* court could conclude that the need for answers to protect the public safety outweighed

the need for *Miranda* warnings, then surely, on the facts before us, it is reasonable to conclude that the need for answers to protect the life of one person outweighs the same need." *Kunkel*, 137 Wis. 2d at 189, 404 N.W.2d at 76.

■ However persuasive we might find this analysis to be, we are constrained by several factors from adopting and applying an exception to the *Miranda* rule in Illinois at this time.

The record below reveals that, unlike the suspect in *Quarles*, defendant in the instant case immediately and unambiguously invoked his right to counsel. The issue in *Quarles* was whether the police were required to give the defendant *Miranda* warnings before neutralizing a dangerous situation. The case before us raises a preliminary issue: whether there exists, independent of the *Miranda* prophylactic rules, an invocable fifth amendment right to counsel. We believe this preliminary issue must be resolved in order to determine whether an exception is being taken to a constitutional right or a prophylactic procedural rule.

We have found no Federal or Illinois Supreme Court cases providing determinative guidance on this question. As our above review of Federal constitutional law indicates, we do not think the United States Constitution affords a fifth amendment right to counsel independent of the *Miranda* procedural rules. The Illinois Constitution provides that "[n]o person shall be compelled in a criminal case to give evidence against himself." (Ill. Const. 1970, art. I, §10.) The Illinois Supreme Court has emphasized analysis of both Federal and State constitutional law in *Miranda* cases. See, *e.g., People v. Scott* (1992), 148 Ill. 2d 479 (confessions must be voluntary according to both Federal and State law principles); *People v. Bernasco* (1990), 138 Ill. 2d 349 (same); *People v. Brown* (1990), 136 Ill. 2d 116 (both Federal and State law applied to determine whether an interrogation was custodial).

An appellate court case currently pending before the supreme court focuses the issue by distinguishing between State and Federal constitutional guarantees. (See *People v. McCauley* (1992), 228 Ill. App. 3d 893.) In *McCauley*, police denied a suspect access to an attorney retained by the suspect's family after the attorney identified himself and requested access. The State urged the court to follow the United States Supreme Court's decision in *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, which held that the police did not violate the defendant's fifth amendment rights by failing to inform the defendant that his family had hired an attorney who wanted to see him. The Appellate Court, First District, found that *Moran* was not controlling and held that the ensuing *incommunicado* interrogation violated the defend-

ant's self-incrimination protection under the Illinois Constitution. The court premised its decision on

> "the fact that a State constitution may be interpreted to give its citizens greater degrees of constitutional protection than the Federal Constitution. [Citations.] The lockstep doctrine for interpreting Illinois constitutional provisions that have parallels in the U.S. Constitution reduces the Illinois Constitution of 1970 to a supernumerary document lacking any real constitutional dimension. Moreover, *** it is plain that the lockstep doctrine [may] exact[ ] too heavy a toll on the protections embodied in the Illinois Constitution of 1970. We therefore reject the lockstep doctrine." *McCauley*, 228 Ill. App. 3d at 896.

The *McCauley* decision throws into question in Illinois the proposition that no right to counsel exists independent of the *Miranda* procedural rules. In the instant case, if it were to be determined that article I, section 10, affords greater protection of a defendant's privilege against self-incrimination than the fifth amendment—that is, if it affords an absolute right to counsel upon invocation of that right—the evidence obtained during defendant's interrogation in the squad car would have to be suppressed. The *Quarles* decision permits an exception only to the *Miranda* procedural requirements, not to the fifth amendment itself. (*Quarles*, 467 U.S. at 654-58, 81 L. Ed. 2d at 555-58, 104 S. Ct. at 2630-33.) If, however, the Illinois Constitution were deemed to afford the same protection as the Federal Constitution—that is, if it affords a right to counsel only by way of the *Miranda* procedural safeguards—then an exception to those safeguards would be viable. If the statements of the defendant passed the traditional fifth amendment voluntariness test, the evidence would be admissible.

■ We need not resolve this constitutional issue in order to dispose of the immediate question before us: whether the trial court properly denied defendant's motion to suppress the statements made to Agent Fuhr in the backseat of the squad car. Since we decline to apply the *Quarles* public safety exception at this time, we find that the trial court erred in admitting those statements, but we hold that the error was harmless due to the overwhelming nature of the remaining evidence against defendant.

Before a constitutional error can be held harmless, the court must be able to declare a belief that it was harmless to the defendant beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 23-24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 827-28; *People v. Griffin* (1983), 117 Ill. App. 3d 177, 183.) The United States Supreme Court has extended the *Chapman* harmless-error rule to the erroneous admission of

involuntary confessions. (*Arizona v. Fulminante* (1991), 499 U.S. 279, 307-12, 113 L. Ed. 2d 302, 329-33, 111 S. Ct. 1246, 1263-66; *People v. Mitchell* (1992), 152 Ill. 2d 274, 327; *People v. Carlson* (1992), 224 Ill. App. 3d 1034, 1041; see also *People v. Toran* (1991), 219 Ill. App. 3d 991, 995 (admission of an involuntary statement at a probation revocation hearing may also be harmless error).) The admission of such a confession is a "trial error," which occurs during a case's presentation to the trier of fact and may, therefore, be quantitatively assessed in the context of other evidence presented in order to determine whether the evidence's admission was harmless beyond a reasonable doubt. *Fulminante*, 499 U.S. at 310-11, 113 L. Ed. 2d at 331-32, 111 S. Ct. at 1265; see also *People v. Patterson* (1992), 154 Ill. 2d 414, 436 (contrasting preponderance of the evidence standard of proof for voluntariness with beyond a reasonable doubt standard for guilt in criminal cases); *People v. Traina* (1992), 230 Ill. App. 3d 149, 154.

Because the State raises harmless error for the first time on review, defendant urges that the argument should be considered waived. Defendant misconstrues the waiver rule. "It is an accepted principle of law that an issue not presented to or considered by the trial court cannot be raised by the *appellant* for the first time on review." (Emphasis added.) (*People v. McAdrian* (1972), 52 Ill. 2d 250, 253.) An appellant's scope of review is limited by his assignment of errors, but an appellee "may sustain the lower court decree by any argument based upon issues appearing in the record." (*In re Estate of Leichtenberg* (1956), 7 Ill. 2d 545, 549.) The issue of the propriety of denying defendant's motion to suppress is well documented in the record, and an argument correlating the effect of that suppression with the remainder of the evidence is permissible.

Moreover, the purpose of the waiver rule does not pertain here. The rationale for the waiver rule is that a theory not urged before the trial court will often cause the opposing party to refrain from offering evidence which could have a positive bearing on the disposition of the case. (*People v. McAdrian*, 52 Ill. 2d at 254; *People v. Nau* (1988), 167 Ill. App. 3d 338, 349-50.) In the case before us, it is difficult to see how defendant could meaningfully argue that incriminating evidence, already made available to the jury, does not matter because the remaining evidence against defendant is not quantitatively overwhelming.

One test for harmless error is to examine the other evidence in the case to see if overwhelming evidence supports the conviction. (*Milton v. Wainwright* (1972), 407 U.S. 371, 33 L. Ed. 2d 1, 92 S. Ct. 2174; *People v. Wilkerson* (1981), 87 Ill. 2d 151, 157.) Defendant was implicated in Douglas' kidnaping by many significant factors. First, the voice on the

tape recordings made by the FBI of the two conversations between the kidnaper and Douglas' father, the admissibility of which is discussed below, was identified by Dr. Bartels as the voice of the caller who phoned him at his office to tell the doctor he had kidnaped his son. It was also the voice Dr. Bartels heard directing him where to deliver the ransom money. Agent Fuhr, who spoke face-to-face with defendant approximately two hours after listening in on the recorded calls, also identified defendant's voice as that of the caller.

The voice on the phone instructed Dr. Bartels to place a brown paper bag containing $100,000 under a mailbox. Two to three minutes after the bag was left, FBI agents observed the same motorcycle rider they had seen in the vicinity of the phone booths to which Dr. Bartels had been directed pick up the bag. The agents followed the motorcycle and demanded that it stop; instead, it accelerated, initiating a high-speed chase.

When defendant was apprehended with the money, a search of his wallet disclosed a receipt from a car rental agency, upon which were written telephone numbers of two of the public phones to which Dr. Bartels had been sent. Investigation established that defendant had rented a van from the rental agency in his own name, secured by his driver's license and credit card. The interior of the van had not been cleaned, and a fibers expert testified that fibers found within the van showed no differences from the fibers of the outfit worn by the victim at the time of the kidnaping. It was also established at trial that defendant had altered his appearance by cutting and highlighting his hair following the time the victim was abducted and before the ransom pickup.

Defendant was identified by the Bartelses' baby-sitter as the man who took Douglas from their home. He was identified by two workers at the car rental agency as the man who rented and returned the van. He was identified by the beauty salon worker as the man whose hair she cut and highlighted the afternoon of the kidnaping. He was identified by FBI agents as the man who had ridden the motorcycle and picked up the ransom money. Defendant presented no countervailing evidence at trial.

We conclude that, while the trial court erred in denying defendant's first motion to suppress, the error was harmless in light of the weight of all the evidence.

The second issue raised on appeal is whether the trial court erred in refusing to suppress the tape recordings of defendant's telephone conversations with Dr. Bartels. Defendant argues that, even though the investigation was a joint Federal and State undertaking and, therefore, Federal eavesdropping law controls, the tapes should have been sup-

pressed because they were not made in compliance with Federal law. We disagree.

■ The use of an eavesdropping device to record all or part of any conversation is prohibited by the Illinois eavesdropping statute unless all parties to the conversation consent or unless one party consents and prior judicial authorization is obtained in accordance with statutory directives. (Ill. Rev. Stat. 1989, ch. 38, par. 14—2.) The Federal eavesdropping statute (title III of the Omnibus Crime Control and Safe Streets Act of 1968) (18 U.S.C. §2510 *et seq.* (1988)) is less stringent. Under Federal law, only one party is required to give prior consent to the eavesdrop.

> "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." 18 U.S.C. §2511(2)(c) (1988).

When Federal and State agents are engaged in a joint investigatory enterprise, noncompliance with the Illinois eavesdropping statute does not require suppression of electronically obtained evidence so long as Federal directives are followed and in the absence of collusion among the authorities to evade the State law. *People v. Mays* (1989), 188 Ill. App. 3d 974; *People v. Winchell* (1986), 140 Ill. App. 3d 244; *People v. Manna* (1981), 96 Ill. App. 3d 506.

■ Since the kidnaping investigation at hand was a joint Federal and State enterprise and no issue of collusion was raised below, the only question to be answered is whether Federal directives were followed.

Defendant does not dispute that Dr. Bartels consented to the interception. Rather, defendant bases his objection to the eavesdrop on a combined reading of two other provisions of the Federal statute. Defendant maintains that these provisions apply to the circumstances of the present eavesdrop and, therefore, after-the-fact judicial authorization and notice to the party overheard were required. We find his reading of the statute's provisions to be erroneous.

Defendant points to 18 U.S.C. §§2518(7)(a) and (7)(b) (1988) to support his assertion that an application for judicial authorization should have been filed within 48 hours of the interception. Section 2518(7) provides in pertinent part:

> "(7) Notwithstanding any other provision of this chapter, any investigative or law enforcement officer, specially designated by the Attorney General, *** or by the principal prosecuting attorney of any State or subdivision thereof acting pursuant to a statute of that State, who reasonably determines that—

(a) an emergency situation exists with respect to *conspiratorial activities threatening the national security interest or to conspiratorial activities characteristic of organized crime* that requires a wire or oral communication to be intercepted before an order authorizing such interception can with due diligence be obtained, *and*

(b) there are grounds upon which an order could be entered under this chapter to authorize such interception,

may intercept such wire or oral communication if an application for an order approving the interception is made in accordance with this section within forty-eight hours after the interception has occurred, or begins to occur." (Emphasis added.) (18 U.S.C. §2518(7) (1988).)

Clearly subsections (7)(a) and (7)(b) are meant to be read in conjunction with one another. Subsection (a) provides only for emergency situations involving conspiratorial activities threatening national security or characteristic of organized crime. The kidnaping of Dr. Bartels' baby does not fall into either of those categories. Thus, judicial authority was not required.

To support his assertion that, as the party overheard, he was required to receive notice of the interception within 90 days, defendant looks to 18 U.S.C. §2518(8)(d) (1988), which reads in pertinent part:

"(d) Within a reasonable time but not later than ninety days *after the filing of an application for an order of approval under section 2518(7)(b)* which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory \*\*\*." (Emphasis added.) (18 U.S.C. §2518(8)(d) (1988).)

Subsection (8)(d) calls for 90-day notice only after an authorization application has been filed under section 2518(7)(b). Since subsection (7)(b) must be read in conjunction with subsection (7)(a), and subsection (7)(a) does not apply to these facts, subsection (8)(d) is equally inapplicable. Therefore, notice to the defendant as the party overheard was not required.

Clearly, neither judicial authority nor notice was required under Federal law where Dr. Bartels consented to the eavesdrop. The trial court's denial of the motion to suppress the tapes is affirmed.

The final issue to be considered on appeal is whether the trial court abused its discretion in sentencing defendant to 30 years' imprisonment.

Defendant claims that the sentence is excessive. Specifically, defendant maintains that, because the trial court in imposing sentence did not mention factors in mitigation or the defendant's rehabilitative potential, the trial court failed to consider them. We disagree and affirm the trial court's sentence.

Aggravated kidnaping for ransom is a Class X felony (Ill. Rev. Stat. 1991, ch. 38, par. 10—2(b)(1)). The Unified Code of Corrections (Code) sets the sentence of imprisonment for a Class X felony at not less than 6 years and not more than 30 years (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(3)). In addition, the Code prescribes a mandatory supervised release term of three years for a Class X felony. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(d)(1).) Defendant's sentence of 30 years' imprisonment plus 3 years' mandatory supervised release falls within the statutory guidelines.

The Code requires that a sentencing hearing be held at which the court shall consider, among other factors, evidence and information offered by the parties in aggravation and mitigation. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—1(a)(4).) The Illinois Constitution, as well as the Code, requires that the objective of restoring an offender to useful citizenship be considered along with the seriousness of the offense. Ill. Const. 1970, art. I, §11; Ill. Rev. Stat. 1991, ch. 38, pars. 1001—1—2(a), (d).

Where evidence is offered in mitigation and before the trial court, the sentencing judge will be presumed to have considered it unless there is some statement in the record, aside from the sentence imposed, which would tend to indicate otherwise. (*People v. Foreman* (1987), 153 Ill. App. 3d 346, 358; *People v. Goodman* (1983), 116 Ill. App. 3d 125, 127-28.) This is especially true where, as here, a review of the record establishes that defense counsel did, in fact, argue factors in mitigation, including defendant's rehabilitative potential. (*Foreman*, 153 Ill. App. 3d at 358.) Although the trial court is required to consider a defendant's potential for rehabilitation, it is not required to give greater weight to that factor than to the seriousness of the offense. *People v. McGee* (1991), 222 Ill. App. 3d 92, 98; *People v. Mack* (1985), 133 Ill. App. 3d 788, 793.

Here, defense counsel presented several factors in mitigation, namely, information about defendant's military record, employment history, prior offenses, and the likelihood of a recurrence. Counsel also presented factors in support of defendant's rehabilitative potential, namely, information regarding defendant's educational history, family, professional motivation, intelligence, and age. Pertinent documents were included in the presentence report, and defense counsel argued both miti-

gating factors and rehabilitative potential at the sentencing hearing and in defendant's motion for reconsideration of the sentence.

Defendant acknowledges that the trial court stated clearly the factors considered in fashioning the sentence. Presumably, defendant's objection is that the trial court made no mention of mitigating factors or rehabilitative potential. Where a sentencing judge articulates factors in aggravation, as in this case, a court of review may assume the trial judge properly considered factors in mitigation. (*People v. Bergman* (1984), 121 Ill. App. 3d 100, 109.) Although we encourage greater elaboration of a trial court's reasoning than is provided in the present case, we acknowledge that the trial court is not required to detail for the record the process by which it concluded that the penalty imposed was appropriate. *Bergman*, 121 Ill. App. 3d at 109; *People v. Reynolds* (1983), 116 Ill. App. 3d 328, 332.

The trial court stated that the reasons for imposing sentence in this case were based on an independent assessment of the evidence received at the trial, consideration of the presentence report, the arguments of counsel, the defendant's statement, the victim impact statement, the purpose of the Code, and factors in aggravation. The court found that serious harm was threatened, that the defendant had a history of delinquency, that the defendant was eligible for an extended term due to the age of the victim, that a prison sentence was not only mandated but necessary to protect the public and the public interest, and that the sentence to be imposed was necessary to deter others from committing the same crime.

It has been stated repeatedly that a trial judge has wide discretion in sentencing a criminal defendant, in order to permit reasoned judgments as to the penalty appropriate to the particular circumstances of each case. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492.) We find that the trial court did not abuse its discretion here and, accordingly, affirm the sentence.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

McLAREN and BOWMAN, JJ., concur.