THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN BURNOM, Defendant-Appellant.

First District (6th Division)    No. 1—01—1261

Opinion filed April 4, 2003.—Rehearing denied May 6, 2003.

TULLY, J., dissenting.

Rick Halprin, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Annette N. Collins, and Susan R. Schierl Sullivan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE O'BRIEN delivered the opinion of the court:

Defendant, John Burnom, appeals his jury conviction for first degree murder and attempted armed robbery, and his respective sentences of natural life in prison and a 15-year concurrent term. On appeal, defendant contends: (1) he is not guilty of first degree murder on the theory of accountability because the excessive force used by police officers operated as a superceding or intervening cause in the death of Ernest Hopkins; (2) the trial court gave a misleading answer to the jury's question regarding excessive resistance; (3) the trial court erroneously applied federal eavesdropping law, rather than state law, when it denied defendant's motion to suppress audio and video recordings; and (4) the trial court erred in admitting gang evidence and proof of defendant's prior criminal convictions. We affirm.

Trial testimony established the following facts.

Patricia Gibbons worked as a special agent for the Bureau of Alcohol, Tobacco and Firearms (ATF), a federal agency, for 13 years. In 1988, she also belonged to the Chicago Anti-Gun Enforcement (CAGE) task force, a joint cooperative effort between ATF agents and Chicago police officers which investigates the purchase and sale of illegal firearms in Chicago. During her CAGE investigations, Special Agent Gibbons discovered that Joseph Vicario had illegally purchased 21 firearms in a three-year period. In February 1998, Vicario was indicted on federal charges for falsifying the federal application form in connection with the purchase of five firearms.

After appearing in federal court on these charges, Vicario met with Special Agent Gibbons and two assistant United States Attorneys on March 19, 1998, and offered his cooperation in their investigation of defendant in exchange for consideration on his case. Specifically, Vicario informed Special Agent Gibbons and the two assistant United States Attorneys that he knew defendant, a high-ranking gang member who ran an area of Chicago called "Motown," and that he had engaged in numerous conversations with defendant regarding the purchase of firearms. Vicario stated that he had sold one of his illegally purchased guns to defendant.

Vicario told Special Agent Gibbons and the two assistant United States Attorneys that he had met with defendant in early March and that defendant had indicated he was interested in purchasing several automatic weapons, seven or eight handguns, and five or six grenades. Defendant proposed to pay for the weapons with a combination of cash and heroin.

Special Agent Gibbons and Vicario formulated a plan whereby Vicario, in an undercover capacity, would meet with defendant on March

30, 1998, for the purpose of selling him firearms in exchange for heroin and cash. The transaction would be monitored by the CAGE task force, headed by Special Agent Gibbons. Vicario would drive a Cadillac specially equipped with a fixed video camera in the dashboard and various microphones and recording equipment.

On March 30, 1998, pursuant to their plan, Vicario met with Special Agent Gibbons and three other CAGE team members—her partner, Special Agent Ken Ryan, and two Chicago police officers, Officer John Coles and Officer Dave Harris—in a parking lot at 87th Street and Kedzie Avenue. Vicario was given the Cadillac with the audio and video surveillance equipment and instructed to remain in the Cadillac at all times so that the surveillance team could monitor Vicario's contact with defendant. Special Agent Gibbons monitored events from her own car, while Special Agent Ryan remained in his own car, and the two police officers were in a car together.

Defendant eventually drove up in a grey, four-door Chevy, exited his vehicle, and entered Vicario's Cadillac. During their 10-minute conversation, the two men agreed that in exchange for various weaponry, defendant would pay Vicario a total of $2,800, in the form of $1,100 in cash and one-half ounce of pure heroin with a street value of $1,700. They agreed to meet again in two days, on April 2, 1998, at a McDonald's parking lot on 79th Street and Western Avenue to conclude the transaction.

On April 2, 1998, CAGE team members Sergeant Alvin Urbikas, Officer Coles, and Officer David Harris (of the Chicago police department), and Special Agent Mike Casey (of the ATF) were dispatched to the McDonald's parking lot at approximately 11 a.m. They were assigned to conduct surveillance from a Chicago police department undercover conversion van and to be the immediate arrest team. The van took up a position in the north end of the McDonald's parking lot, approximately five spaces east of the western curb.

Meanwhile, Vicario arrived at 87th Street and Kedzie Avenue and was given the specially equipped Cadillac. Vicario then went to defendant's "Motown" neighborhood, in the area of 51st Street and Racine Street, and began asking around if anyone had seen defendant. Special Agent Gibbons and two other ATF agents followed Vicario in a separate vehicle.

Vicario eventually spoke with a man named "Ernest," later identified as the victim, Ernest Hopkins. Vicario explained to Ernest that he was trying to locate defendant. Ernest told Vicario how to page defendant.

Defendant returned Vicario's page at approximately 2:20 p.m., and the two men came to an agreement to meet between 3:15 and 3:30

p.m. at the McDonald's parking lot. Special Agent Gibbons, the two ATF agents, and Vicario then drove to a forest preserve on 87th Street, where Special Agent Gibbons put a suitcase full of weapons in the trunk of the Cadillac. Special Agent Gibbons told Vicario that the guns were not to leave the trunk of the car, and she also told him to park as close as possible to the covert van in the McDonald's parking lot.

At approximately 3 p.m., Vicario arrived at the McDonald's parking lot and pulled into a spot at the north end of the lot, in close proximity to the covert van containing Sergeant Urbikas, Officer Coles, Officer Harris, and Special Agent Casey. Meanwhile, Special Agent Gibbons took up surveillance from a Shell gas station located on the northwest corner of 79th Street and Western Avenue, adjacent to and south of the McDonald's parking lot. Officer George Klinger, who was on the surveillance team, also took up a spot in the Shell station.

CAGE team member Officer Larry Knysch took up location in a covert car at approximately 2450 W. 79th Street. His position was south of the McDonald's and a little bit west of the Shell station. His duty was to prevent anyone from accessing the scene from the alley, which feeds into the McDonald's parking lot.

At approximately 3:20 p.m., when all the surveillance units were in place, Vicario called defendant and told him that he had the "stuff." Shortly thereafter, at 3:30 p.m., a small green car pulled up next to Vicario's Cadillac. There were two men in the green car, including the victim, Ernest Hopkins, who had earlier told Vicario how to page defendant. Vicario told them that he was looking for defendant, and they replied that he was on the way. Vicario then stated that he would only deal with defendant.

The green car backed away and parked for a few moments alongside the covert van. The driver of the green car, later identified as Lavon Brown, reached under the seat, retrieved a handgun, and handed it to Ernest Hopkins. Hopkins put the gun in his waistband and covered it with his shirt.

The green car then drove into the Shell station. At approximately this time, Special Agent Gibbons observed defendant parked in the Shell station. Special Agent Gibbons and Officer Klinger saw defendant, who was wearing a blue, hooded sweatshirt and dark pants, walk over to the green car. Defendant leaned into the green car on the driver's side and conversed with the two occupants for approximately 1½ to 2 minutes. Defendant then walked back to and reentered his car; meanwhile, the green car exited the Shell station.

Less than a minute later, defendant pulled his car southbound through the gas station and parked just south of Officer Klinger's car.

Defendant exited his vehicle and walked to the alley on the south side of 79th Street. He looked straight down the alley to the north toward Vicario's Cadillac.

The green car reentered the McDonald's parking lot and backed alongside the covert van. From inside the van, Sergeant Urbikas observed the driver, Lavon Brown, and the passenger, Ernest Hopkins, switch positions. Brown had a handgun in his waistband. Because Sergeant Urbikas could only see the butt of the handgun, he did not know whether it was the same gun he had seen Brown hand to Hopkins.

The green car pulled up next to the Cadillac. Vicario again told the two men to back away, that he was waiting for defendant. Brown exited the green car with a gun in his hands and told Vicario to exit the Cadillac. As Vicario was exiting his vehicle, Brown placed the gun to Vicario's forehead.

Special Agent Gibbons immediately told her surveillance team to go in. Sergeant Urbikas was the first to exit the van, followed by Officer Harris and then the other two officers. Both Sergeant Urbikas and Office Harris testified that they ran around the van toward Vicario and Brown and screamed "police, police" and ordered Brown to drop his gun.

Brown fired his gun at Vicario, the bullet passing to the right of Vicario's head. Vicario suffered burns from the gunshot and could not hear as a result of the gun going off so close to his ear. After the shot, Vicario went down to a squatting position.

Sergeant Urbikas and Officer Harris observed Brown fire his gun at Vicario. Officer Harris testified that he thought Brown had killed Vicario and he next observed Brown aiming his gun at the approaching Sergeant Urbikas. Officer Harris testified that he fired a shot at Brown.

At this point, Brown began running along the chain-link fence that lines the west side of the McDonald's parking lot. As he was running, Brown turned and pointed his gun in Sergeant Urbikas's direction. Sergeant Urbikas fired two shots at Brown. Brown turned around again and, still with the gun pointed toward Sergeant Urbikas, began to run northbound. Sergeant Urbikas continued yelling and heard gunshots from behind him. Brown then threw himself onto the ground, ending up by a tree.

Sergeant Urbikas saw Special Agent Casey coming along the fence to cover Brown. At approximately the same time, Hopkins, who was still in the driver's seat of the green car, revved the engine and sped backwards, with the tires squealing. Sergeant Urbikas had to jump out of the way of the car to avoid being hit.

Sergeant Urbikas saw that Hopkins was completely turned to his right and that his right arm was extended straight out behind him. He heard Officer Coles screaming "stop him, stop him" and thought that the others had been run over. Sergeant Urbikas also heard gunfire and the sound of glass breaking and he saw that the rear passenger window of the green car had been broken out. Thinking that Hopkins was shooting at the officers, Sergeant Urbikas fired into the driver's side of the car.

Meanwhile, Officer Harris had observed Sergeant Urbikas jump out of the way of the green car and he thought that Urbikas had been hit. He, too, heard Officer Coles scream "stop him, stop him" and saw Officer Coles fire one shot into the car. Approximately the same time, Officer Harris saw that Hopkins was "making a motion" with his extended right hand in Officer Harris's direction and Officer Harris believed that Hopkins was armed. Officer Harris therefore fired twice into the car.

The green car continued backward at a high rate of speed. It hit a concrete divider, bounced forward, and came to rest. Hopkins, who had been shot in the back and in the face, died as a result of his wounds.

Sergeant Urbikas ran back to where Special Agent Casey had been covering Brown. Officer Harris also ran over to Brown, handcuffed him, and took him into custody. Brown told him that he had been shot in the arm. The officers called for medical attention for Brown, who sustained six bullet holes to the outer forearm of his left arm and four bullet holes to the inner forearm of his left arm.

Officer Knysch and Officer Klinger testified that as the shooting in the McDonald's parking lot broke out, defendant ran north across 79th Street and entered his car, which he had parked at the Shell station. Officer Knysch ran over to defendant with his gun out and shouted "police, stop." Defendant ignored Officer Knysch, pulled south out of the gas station, and turned onto Western Avenue. Pursued by Officer Knysch and Officer Klinger, defendant eventually crashed into a wrought iron fence at the alley side of a church. Officer Knysch approached the car and arrested defendant.

Special Agent Dan Young of the ATF testified that defendant was a "prince" in the Black P. Stone Nation street gang and that Hopkins and Brown were also members of that same gang.

Judy and Gary Burk, who were in the Shell station parking lot at the time of the incident, testified for the defense. Both Mr. and Mrs. Burk observed a green Chevy next to a black Cadillac in the McDonald's parking lot. Gary Burk testified that he saw two youths approach the man in the Cadillac. As they spoke, the two youths "upped

with weapons" and police "looked like they came from out of the pavement."

The two youths tried to jump back into their green car. One of the officers ran around to the driver's side and discharged anywhere from 4 to 18 shots at the driver. At the same time, the officer reached into the car and "cut it off" and the car stopped. The car was not accelerating and never had the opportunity to get up any speed.

Gary Burk saw the passenger in the green car jump out and go behind a tree. The police yelled "drop your weapon," which he did, and then the police shot the passenger in the leg.

Judy Burk testified that as the man exited the Cadillac to talk to the occupants of the green car, "shots started coming from everywhere." She observed a police officer reach into the green car. The green car stopped, the police opened the door, and the driver fell out.

Both Mr. and Mrs. Burk observed an unmarked police car speeding through the driveway of the McDonald's lot. The car hit a young student and kept on going. Special Agent Gibbons testified that the student was hit by an officer while in pursuit of defendant.

Detective Steven Buglio testified that he was assigned to investigate the case and that he had interviewed Officer Klinger. Detective Buglio testified that his report did not indicate that Officer Klinger ever stated that he had seen defendant speaking to two people in the green car at the Shell station.

The jury convicted defendant of felony murder and attempted armed robbery based upon accountability, and the trial court sentenced him to natural life in prison and a concurrent term of 15 years. Defendant filed this timely appeal.

■ First, defendant argues that the State failed to prove him guilty beyond a reasonable doubt based on a theory of accountability. When presented with a challenge to the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Mayoral*, 299 Ill. App. 3d 899, 912 (1998).

■ Accountability for felony murder exists only if the defendant may be deemed legally responsible for the felony (here, attempted armed robbery) that accompanies the murder. *People v. Pollock*, 202 Ill. 2d 189, 211 (2002). Defendant contends that he was not legally responsible for the attempted armed robbery perpetrated by Ernest Hopkins and Lavon Brown and, thus, that his convictions for attempted armed robbery and felony murder cannot stand.

■ We disagree. Section 5—2(c) of the Criminal Code of 1961 provides that a person is legally accountable for the conduct of another

when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1992). Factors to consider in determining defendant's legal accountability include: (1) defendant's presence during the commission of the offense; (2) defendant's continued close affiliation with other offenders after the commission of the crime; (3) defendant's failure to report the incident; and (4) defendant's flight from the scene. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995).

■ Section 5—2(c) incorporates the "common design" rule, which provides, " 'where two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts.' " *People v. Terry*, 99 Ill. 2d 508, 514 (1984), quoting *People v. Kessler*, 57 Ill. 2d 493, 496-97 (1974). Evidence that defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *People v. J.H.*, 136 Ill. 2d 1, 17 (1990).

■ In the present case, there was evidence that on March 30, 1998, defendant (a "prince" in the Black P. Stone Nation gang) arranged the weapons/drug transaction with Vicario. On the day of the transaction (April 2, 1998), Hopkins and Brown, who were members of defendant's gang, met with Vicario in the McDonald's parking lot and told him that defendant was on the way. Hopkins and Brown subsequently drove to the nearby Shell station and spoke with defendant, then immediately drove back to the McDonald's parking lot, where Brown pulled his weapon on Vicario.

Meanwhile, defendant took up a position in an alley on the south side of 79th Street, where he was able to view the proceedings in the McDonald's parking lot. When the shooting broke out, defendant ran to his car, ignored Officer Knysch's command to stop, and fled the scene.

From all these facts, a rational jury could conclude that defendant engaged in a common criminal design with his fellow gang members Hopkins and Brown to rob Vicario by force, making him legally accountable for the attempted armed robbery.

■ Next we address whether a rational jury could find defendant guilty of the felony murder of Ernest Hopkins. The purpose of the felony murder statute is to deter persons from committing forcible felonies (such as attempted armed robbery) by holding them respon-

sible for murder if death results from their criminal acts. *People v. Dennis*, 181 Ill. 2d 87, 105 (1998). Illinois follows the proximate cause theory of felony murder liability such that liability attaches for any death proximately resulting from the commission of the underlying felony, even where the death results from the actions of the victim of the felony or by a third party trying to prevent the commission of or resist the felony. *People v. Dekens*, 182 Ill. 2d 247 (1998); *People v. Lowery*, 178 Ill. 2d 462 (1997); *People v. Pugh*, 261 Ill. App. 3d 75, 77 (1994).

■ Defendant contends that the police officers' "excessive use of force" against the victim, Ernest Hopkins, operated as an intervening or superceding cause of Hopkins' death, thereby breaking the chain of proximate cause and relieving defendant of liability.

This case is similar to *People v. Lowery*, 178 Ill. 2d 462 (1997). In *Lowery*, the intended victim of an armed robbery shot at defendant (one of the fleeing robbers) and struck and killed an innocent bystander instead. *Lowery*, 178 Ill. 2d at 464. On appeal from his felony murder conviction, defendant first argued that the supreme court should overrule the proximate cause theory of felony murder liability. *Lowery*, 178 Ill. 2d at 466. The supreme court disagreed, stating:

> "It is equally consistent with reason and sound public policy to hold that when a felon's attempt to commit a forcible felony sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act. Thus, there is no reason why the principle underlying the doctrine of proximate cause should not apply to criminal cases. Moreover, we believe that the intent behind the felony-murder doctrine would be thwarted if we did not hold felons responsible for the foreseeable consequences of their actions." *Lowery*, 178 Ill. 2d at 467.

Defendant then argued that the intended victim's act was an intervening cause because it was not foreseeable that he would act as a "vigilante" and take the law into his own hands. *Lowery*, 178 Ill. 2d at 470-71. The supreme court disagreed:

> "It is true that an intervening cause completely unrelated to the acts of the defendant does relieve a defendant of criminal liability. ***
>
> Here, we do not believe that [the intended victim's] act of firing at defendant was intervening or coincidental. [The intended victim's] resistance was in direct response to defendant's criminal acts and did not break the causal chain between defendant's acts and decedent's death. It would defeat the purpose of the felony-

murder doctrine if such resistance—an inherent danger of the forcible felony—could be considered a sufficient intervening circumstance to terminate the underlying felony or attempted felony." *Lowery*, 178 Ill. 2d at 471.

Defendant argued that the intended victim was not legally justified in firing at defendant. *Lowery*, 178 Ill. 2d at 473. The supreme court held that defendant's argument was "misplaced":

"[T]he proper focus of this inquiry is not whether [the intended victim] was justified in his actions, but whether defendant's actions set in motion a chain of events that ultimately caused the death of decedent. We hold that defendant's actions were the proximate cause of decedent's death and the issue of whether [the intended victim's] conduct was justified is not before this court." *Lowery*, 178 Ill. 2d at 473.

As in *Lowery*, the defendant here set in motion the chain of events that ultimately caused the death of Ernest Hopkins. Specifically (as discussed above), there was evidence that defendant engaged in a common criminal design with his fellow gang members Brown and Hopkins to rob Vicario by force. Pursuant to that end, Brown and Hopkins met Vicario at the McDonald's parking lot, and Brown exited his car with a gun in his hands and aimed it at Vicario. The undercover officers immediately converged on the scene, whereupon Brown fired his gun at Vicario and attempted to flee. Brown eventually gave himself up after Sergeant Urbikas fired two shots at him.

Meanwhile, Hopkins revved up the car engine and sped backwards. Sergeant Urbikas and Officer Harris heard Officer Coles shout "stop him, stop him." Sergeant Urbikas saw that Hopkins' right hand was extended straight out behind him and that the rear passenger window had been broken out. Thinking that Hopkins was shooting at the officers, Sergeant Urbikas fired his shotgun into the driver's side of the car. Officer Coles and Officer Harris also fired into the car. Hopkins died as a result of his gunshot wounds.

As in *Lowery*, the officers' resistance was in direct response to the attempted armed robbery set in motion by defendant and did not break the causal chain between defendant's acts and Hopkins' death. Defendant's actions were the proximate cause of Hopkins' death and thus a rational jury could find defendant guilty of felony murder. We affirm defendant's convictions.

Defendant contends, though, that at the time of the shooting, the attempted armed robbery was over and Hopkins was merely trying to escape. Defendant argues that he may not be convicted of felony murder based on attempted armed robbery where the attempted armed robbery was over at the time Hopkins was killed.

*People v. Dennis*, 181 Ill. 2d 87 (1998), is dispositive. In *Dennis*, the defendant drove a passenger to an area where drugs were sold, in order to purchase narcotics. After being dropped off, the passenger saw two men in an alley and decided to rob them. The passenger then ran back to the defendant's car and defendant sped away. *Dennis*, 181 Ill. 2d at 89-91. The issue in *Dennis* was whether the defendant's participation in the escape was an element of the offense of armed robbery that could form the basis for accountability-based guilt. *Dennis*, 181 Ill. 2d at 95.

The supreme court noted that armed robbery is the taking of property " 'from the person or presence of another by the use of force or by threatening the imminent use of force' while 'armed with a dangerous weapon.' " *Dennis*, 181 Ill. 2d at 101, quoting 720 ILCS 5/18—1, 18—2(a) (West 1994). The court further stated:

> "Neither flight from pursuing victims nor escape is included as an element in the statutory definition of robbery. See 720 ILCS 5/18—1(a) (West 1994). Thus, *** the offense of armed robbery is complete when force or threat of force causes the victim to part with possession or custody of property against his will. Although *the force which occurs simultaneously with flight or an escape may be viewed as continuing the commission of the offense* [citations], it is the force, not escape, which is the essence and constitutes an element of the offense. The commission of an armed robbery ends when force and taking, the elements which constitute the offense, have ceased." (Emphasis added.) *Dennis*, 181 Ill. 2d at 103.

In the present case, there was evidence that the victim, Ernest Hopkins, was attempting to run down police officers with his car at the time he was shot. Hopkins' use of force (*i.e.*, his use of the car as a weapon) continued the commission of the attempted armed robbery (*Dennis*, 181 Ill. 2d at 103); thus, contrary to defendant's argument, the attempted armed robbery was *not* over at the time of the shooting. Accordingly, defendant's conviction of felony murder predicated on the attempted armed robbery stands.

■ Next, defendant argues that the trial court erred in its response to a question from the jury. The trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). This is true even though the jury was properly instructed originally. *Childs*, 159 Ill. 2d at 229. Here, the question at issue concerned the following jury instruction:

> "To sustain the charge of first degree murder, it is not necessary for the State to show that it was or may have been the original

intent of the defendant or one for whose conduct he is legally responsible that the deceased, Ernest Hopkins, be killed. It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an unlawful act such as to commit armed robbery and that during the commission of this unlawful act they were met with resistance which resulted in the deceased, Ernest Hopkins, being killed."

■ The jury sent out a note asking, "Provide definition of 'resistance' and is it permissible to consider whether resistance was excessive?" In response, the court told the jury to use its everyday understanding of the definition of "resistance" and to consider whether the resistance was foreseeable.

The trial court's response was a correct statement of law. As discussed above, under the proximate cause theory of felony murder liability, defendant is guilty of felony murder if the police resistance (and concomitant shooting) was a reasonably foreseeable result of his criminal activity.

Next, defendant argues that the trial court erroneously denied his motion to suppress the March 30 and April 2 audio and video recordings. Defendant contends that Illinois's eavesdropping law was violated because the recordings were made based only on the consent of one of the parties (Vicario) and without any prior judicial authorization. The State responds that the recordings were properly made in accordance with federal law.

■ The use of an eavesdropping device to record all or part of any conversation is prohibited by the Illinois eavesdropping statute (725 ILCS 5/108A—1 (West 2000)) unless all parties to the conversation consent or unless one party consents and prior judicial authorization is obtained in accordance with statutory directives. *People v. Laliberte*, 246 Ill. App. 3d 159, 175 (1993). The federal eavesdropping statute (18 U.S.C. § 2511(2)(c) (2000)) is less stringent and only requires one party to give prior consent to the eavesdrop. *Laliberte*, 246 Ill. App. 3d at 175.

■ When federal and state agents are engaged in a joint investigatory enterprise, noncompliance with the Illinois eavesdropping statute does not require suppression of electronically obtained evidence as long as the agents complied with federal law and there was no *collusion* to evade the Illinois statutory requirements. *Laliberte*, 246 Ill. App. 3d at 175. "Collusion" means " 'secret agreement; secret cooperation for a fraudulent or deceitful purpose.' " *People v. Hodge*, 220 Ill. App. 3d 886, 889 (1991), quoting Webster's Third New International Dictionary 446 (1986).

■ Here, the evidence at the hearing on the motion to suppress and at trial showed that Special Agent Gibbons, a federal ATF agent, initiated the investigation of defendant on federal firearms offenses after Vicario told her that defendant was interested in purchasing weapons for heroin and cash. After Vicario consented to the recording of his conversations with defendant, Special Agent Gibbons "went through ATF notification procedures for consensual overhears," *i.e.*, she notified her supervisor and the assistant United States Attorney on the case that she was going to use a "consensual monitoring overhear."

The ATF assigned Special Agent Gibbons to the CAGE unit, a joint cooperative effort between the ATF and the Chicago police department investigating illegal firearm purchases and sales in Chicago. Special Agent Gibbons used the CAGE team to assist in the arrest and to protect the federal informant, Vicario.

There is absolutely no evidence that the state and federal agents colluded with one another to avoid the Illinois law on eavesdropping. As the agents complied with federal law and did not collude to avoid the Illinois statutory requirements, the audio and video recordings were properly admitted. The trial court did not err in denying defendant's motion to suppress.

■ Next, defendant argues that the trial court erred in admitting Officer Cooper's and Officer Wofford's testimony about other crimes committed by defendant. Generally, evidence of other crimes is inadmissible if relevant merely to establish defendant's propensity to commit crime. *People v. McKibbins*, 96 Ill. 2d 176, 182 (1983). However, evidence of other crimes is admissible if relevant for any purpose other than to show the propensity to commit crime, such as to prove *modus operandi*, intent, identity, motive, or absence of mistake. *McKibbins*, 96 Ill. 2d at 182. Evidence of other crimes may be used only when the other crimes have some threshold similarity to the crime charged. *People v. Bartall*, 98 Ill. 2d 294, 310 (1983). It is this similarity that increases the relevance of the evidence and ensures that it is not being used solely to establish defendant's criminal propensities. *Bartall*, 98 Ill. 2d at 310.

At trial, Officers Cooper and Wofford testified that in 1989, they investigated defendant for drug dealing. In an undercover capacity, Officer Cooper arranged to purchase one kilo of cocaine from defendant for $22,000. The transaction was to take place at a McDonald's at 55th Street and Halsted Avenue, and the officers anticipated that they would arrest defendant after completing the drug sale.

Officer Cooper arrived at the McDonald's parking lot and spoke with defendant, who asked to see the money. Officer Cooper paged Of-

ficer Wofford, who drove to the parking lot and showed defendant a brown paper bag containing $24,000. Officer Wofford then left the area.

Defendant phoned his drug source, then told Officer Cooper that the drugs would be brought in a brown Chevrolet. Defendant stated that he wanted to count the money, so Officer Cooper again paged Officer Wofford. Officer Wofford returned to the McDonald's parking lot and counted the money in front of defendant.

Defendant and Officer Wofford agreed to conduct the exchange in the middle of the parking lot. As they were walking, defendant directed Officer Wofford's attention to the approaching brown Chevrolet. As Officer Wofford looked toward the Chevrolet, he felt a tug on the money bag he was carrying in his right hand. Officer Wofford turned and saw that defendant was pulling on the money bag and that he had a gun "alongside his leg."

Defendant told Officer Wofford to give him the money or else he would "blow [Officer Wofford's] f----- head off." After a struggle, defendant grabbed the money and ran away while firing shots at the officers who unsuccessfully pursued him.

■ In the case at bar, defendant negotiated with Vicario to purchase weapons in exchange for cash and drugs. The transaction was to take place at a McDonald's parking lot. Just prior to the transaction, defendant conferred with his fellow gang members, who then drove to the McDonald's parking lot while defendant looked on in a nearby alley. One of the gang members, Brown, pulled a gun on Vicario and fired a shot, and the officers swarmed on the scene.

The present case shares many similarities to the 1989 incident (*i.e.*, defendant arranging an illegal transaction involving cash and drugs, the location in a McDonald's parking lot, the use of a weapon in an attempt to rob the other party, shots fired) and was therefore relevant and admissible to show defendant's intent to rob Vicario and to dispel any notion that defendant was mistakenly involved. Accordingly, the trial court did not err in admitting Officer Cooper's and Officer Wofford's testimony.

•■ Next, defendant argues that Vicario improperly testified to other crimes committed by defendant, specifically, that defendant had engaged in other attempted arms transactions with Vicario. The trial court cured any error by sustaining defendant's objection and instructing the jury to disregard Vicario's testimony. *People v. Brown*, 222 Ill. App. 3d 703, 721 (1991).

■ Defendant also argues that Vicario improperly testified, with regard to their meeting place at the McDonald's at 79th Street and Western Avenue, that he had met defendant at that location before.

Defendant fails to show how he was prejudiced by Vicario's isolated comment; we find no reversible error.

Next, defendant argues that the trial court erred in admitting gang evidence. Gang-related evidence is admissible to show common purpose or design or to provide a motive for an otherwise inexplicable act. *People v. Williams*, 324 Ill. App. 3d 419, 431 (2001). However, such evidence must be related to the crime charged. *Williams*, 324 Ill. App. 3d at 431.

Here, the evidence showed that defendant was a "prince" in the Black P. Stone Nation gang and that Hopkins and Brown were fellow members of the same gang. Such gang-related evidence was relevant and admissible to show their motive for setting up the arms transaction with Vicario (*i.e.*, they wanted the weaponry for their gang). Further, at trial, defendant attempted to disassociate himself from the actions of Brown and Hopkins and argued that he did not intend to commit armed robbery. The gang-related evidence was relevant to show that there was a common design among the three men such that defendant was accountable for the attempted armed robbery and felony murder.

Next, defendant argues that the State committed a discovery violation by failing to disclose Agent Young's testimony (about defendant's gang status) until the day of trial. We find no discovery violation, as our review of the record indicates that the State disclosed Agent Young approximately 1½ years prior to trial and specifically informed defense counsel approximately one month before trial that Young would be called as their gang expert.

Next, defendant argues that the State committed a discovery violation by failing to tender until the time of trial three reports that would be the subject of Young's testimony. One of the reports involved a 1995 interview between Agent Young and the defendant; we find no prejudicial error, as review of the record indicates that the State never questioned Young about the 1995 interview.

The other two reports indicated that defendant was a leader in the Black P. Stone Nation street gang. We find no prejudicial error, as the State had disclosed approximately 1½ years prior to trial that defendant was a leader of that gang.

For the foregoing reasons, we affirm the circuit court.

Affirmed.

GALLAGHER, J., concurs.

JUSTICE TULLY, dissenting:

I respectfully dissent.

As our supreme court recently observed:

"The purpose behind the felony-murder statute is to limit the violence that accompanies the commission of forcible felonies, so that anyone engaged in such violence will be automatically subject to a murder prosecution should someone be killed during the commission of a forcible felony." *People v. Belk*, 203 Ill. 2d 187, 192 (2003).

Because of the extremely violent nature of felony murder, Illinois courts have sought the broadest bounds for the attachment of criminal liability. *People v. Dennis*, 181 Ill. 2d 87, 105 (1998). However, I believe that the felony murder rule, as applied by the majority, has been given too broad a scope.

At common law, any unlawful killing occurring during the commission of any felony was murder. See *People v. Morgan*, 197 Ill. 2d 404, 445-46 (2001). In Illinois the common law definition of felony murder has been expanded in two significant ways. Under the so-called "felony-murder escape rule," Illinois courts expanded the definition of during the commission of a felony to include a killing committed during an attempt to escape after the commission of a felony. See *People v. Bongiorno*, 358 Ill. 171 (1934); but see *Dennis*, 181 Ill. 2d at 105 (holding that the escape rule is solely applicable to felony murder and not a general rule of accountability). Similarly, Illinois courts have applied the proximate cause theory of felony murder to expand the reach to the felony murder beyond deaths caused by the actions of a defendant or his accomplices to deaths caused by third parties acting in response to the forcible felony. See *People v. Lowery*, 178 Ill. 2d 462, 470 (1997). The proximate cause theory has even been applied to create a liability for felony murder when the individual killed is an accomplice in the underlying felony. See *People v. Dekens*, 182 Ill. 2d 247, 252 (1998). The rationale underlying *Dekens* and *Lowery* was that those who commit forcible felonies should know that they may encounter violent resistance. See *Lowery*, 178 Ill. 2d at 470.

In the case before us, the majority expands the felony murder rule in both directions simultaneously. In doing so, I believe the majority has stretched the felony murder rule beyond the breaking point. I believe that it is reasonable to assume that a defendant who contemplates the commission of a violent felony also contemplates the potential for violence during any escape from the scene of the crime. I also believe that it is reasonable to assume that a defendant who contemplates the commission of a violent felony can anticipate a potentially violent response. I do not, however, believe that such a felon contemplates the possibility that an unarmed accomplice will be

shot by the police while attempting to escape. Accordingly, I do not believe that the deterrent effect of the felony murder rule is served by imposing criminal liability in response to such an unlikely turn of events. I believe that under the facts before us, the majority's errors are twofold. First, the majority defines force too broadly and improperly extends the duration of the attempted robbery to include an escape attempt that did not include the use of force, or at most involved a use of force distinct from the force used in the robbery attempt. Second, the majority adopts a view of proximate cause that is too broad. I believe that under the circumstances of this case the use of force by the police was an intervening cause. Therefore, I would reverse defendant's conviction for felony murder.