# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***People v. Woods*, 2011 IL App (1st) 092908**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL WOODS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-09-2908 |
| Filed | November 22, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for first degree murder and armed robbery, the appellate court rejected defendant's contention that his trial counsel's concession to defendant's guilt of armed robbery amounted to ineffective assistance of counsel to the extent that the concession amounted to a concession of guilt to the first degree murder charge under the theory of felony murder, since defendant's counsel acted as defendant's advocate throughout the proceedings, he developed a theory of defense in opening and closing arguments that even though defendant was guilty of armed robbery, the shooting that erupted in the course of the robbery was not foreseeable, the death of one of the robbers was the result of police misconduct that broke the causal connection between the death and the robbery, he did not completely fail to subject the State's case to meaningful adversarial testing, the evidence against defendant was overwhelming, and even though defense counsel's argument had no legal basis as a defense, it did not constitute ineffective assistance. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-4088; the Hon. Marcus R. Salone, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Sarah Curry, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary Needham, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Quinn and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Michael Woods appeals from his conviction after a jury trial of first degree murder and armed robbery, and his sentence of two concurrent 20-year terms of imprisonment. On appeal, he contends that his trial counsel provided ineffective assistance when he conceded Woods' guilt to the armed robbery charge which, he argues, amounted to a concession of guilt to the first degree murder charge under the theory of felony murder.[1]

¶ 2                                    JURISDICTION

¶ 3     The trial court sentenced Woods on October 7, 2009, and he filed a timely notice of appeal on October 7, 2009. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

---

[1]In his main brief, Woods also raised the issue that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007), when it failed to inquire of potential jurors whether they accepted and understood the four *Zehr* principles. However, in his reply brief Woods conceded that he did not object to the inquiry at the time, nor did he argue that the evidence was closely balanced. Therefore, Woods acknowledges that *People v. Thompson*, 238 Ill. 2d 598 (2010), effectively forecloses this argument on appeal.

¶ 4                                             BACKGROUND

¶ 5        Sergeant Sliva testified for the State in Woods' jury trial. Sliva stated that on January 17, 2006, around 8:30 p.m., he took part in a team conducting surveillance at an Auto Zone auto store at Central and Diversey in Chicago. Around 10 p.m., he noticed a maroon vehicle pull into the store's parking lot. Three people exited the vehicle and entered the store. One of the three pulled his hoodie up before entering the store. Through the front door, Sliva saw that an individual wearing a white dust mask used keys to lock the door from the inside. Based on his experience, he believed a robbery was taking place and he radioed for assistance. Officers responded "within a minute" and took cover behind the maroon vehicle. Sliva assumed that other officers stood guard behind the building because he had asked for help in forming a perimeter "to prevent any escape routes."

¶ 6        As Sliva watched the front door, he observed a male wearing a black jacket with a hoodie and a dust mask over his face come to the door. Sliva stated that the man, later identified as Cleon Jones, had a weapon in his right hand and keys in his left hand. After Jones unlocked the door, he turned toward Sliva and the other officers with him. One of the officers said, "Police. Drop the gun." Jones, however, raised the gun toward the officers at which point Sliva discharged his gun approximately nine times. Other officers also discharged their weapons. Sliva believed they had fired about 39 shots altogether.

¶ 7        One of the shots fired hit Jones, who took a couple of steps back and fell. Sliva did not see anyone else in the store at the time. The officers then entered the store whereupon Sliva observed Jones on the floor and, about 15 feet behind him, a bluesteel revolver. Sliva testified that the revolver was the same weapon Jones had pointed at the officers earlier. He then searched the aisles looking for the two other offenders whom officers subsequently detained in the store.

¶ 8        During cross-examination, Sliva stated that his weapon was a semiautomatic weapon that would take only "a second or two" to discharge the nine rounds he fired at Jones. He acknowledged that he did not know whether officers continued to fire rounds at the other offenders after Jones had been hit. Defense counsel also elicited testimony from Sliva that two officers on the scene fired 16 rounds and 8 rounds, respectively, at Jones.

¶ 9        Adrian Matos testified that on January 17, 2006, he worked for the Auto Zone as a parts and sales manager. Just before 10 p.m. that evening, he was at the store with two employees, Oscar Pizano and Jonathan Laluz. While Matos was talking to Pizano in the front of the store, a man wearing a scarf entered. He walked past Matos and then another man walked in behind him. The second man wore a painter's mask and he told Matos not to touch anything. The men grabbed Matos and Pizano and took them to the back of the office, where they demanded that Matos and Pizano empty their pockets. Laluz was also in the room and the men forced him to empty his pockets.

¶ 10       The men told Matos to open the safe in the office. After Matos opened the safe, they told him to lie down and proceeded to tie his hands behind his back with a spark plug cable. Matos testified that he believed Pizano and Laluz were also tied up and on the ground. One of the men took his store keys and Matos heard him lock the front door. Then the men tried to break open the inner safe and he heard something like change falling into a bag. The men

-3-

instructed Matos, Pizano and Laluz not to move and told them to count to 10. Matos heard footsteps to the front door, and then he heard "it's the police" or "it's the cops" before gunfire erupted. When he heard the gunshots, Matos broke free of the cable and pulled Pizano and Laluz to a corner. Soon after, an officer came by and they identified themselves as employees of the store.

¶ 11    Laluz testified that on January 17, 2006, just before 10 p.m., he was in the back of the store stocking parts. Two other employees, Matos and Pizano, were also in the store at the time. He observed two African-American men wearing painters' masks walk into the store. When Laluz walked to the front of the store, another man, wearing a scarf, held a gun to his head. The scarf covered everything on the man's face except for his eyes. The man with the gun told Laluz to "follow my lead" and they walked down the aisles. He then took Laluz to the office area, where Laluz saw the other employees tied up, facedown on their stomach. Two men wearing painters' masks were in the office. One told Laluz to get down on his knees, and he was tied with a telephone wire. The men with masks tried to break open the safe. Laluz testified that he did not know which person had the gun in the office area. One of the men walked to the front door and "shots started coming in the office." The two other men ran to the emergency doors in the back and then police entered the office.

¶ 12    On cross-examination, Laluz stated that before gunshots were fired, he did not hear anyone yell, "Drop the gun. Drop the gun." He also did not see anyone actually open the front door before shots were fired.

¶ 13    Pizano testified that on January 17, 2006, shortly before 10 p.m., he was getting ready to leave the store and Matos was walking him out. A man approached wearing a scarf around his face. Two others wearing dust masks followed him into the store. The man with the scarf pulled a gun out of his waistband and told Pizano to turn around and go to the back. The two men wearing masks took Pizano and Matos to the back and tied their hands and feet with spark plug wires. When Laluz came into the office, the men also tied him up. Pizano testified that he could not see at this point who had the gun. One of the men told them that as long as they got the safe open, no one would get hurt. Pizano then heard footsteps going toward the door, and shortly after, he heard gunshots. The shots lasted about five seconds.

¶ 14    On cross-examination, Pizano stated that he never saw the men wearing masks with a gun. Pizano also stated that although he heard the front door open, he did not hear officers identifying themselves as police or any voices at all.

¶ 15    Maurice Henderson testified that he worked as a forensic investigator for the Chicago police department. On January 17, 2006, he processed a crime scene at Diversey and Central in Chicago. He searched Jones' body and found three white envelopes containing $1,200, and a money bag containing $1,411. He also recovered a six-shot revolver.

¶ 16    On cross-examination, Henderson stated that they did not inventory the keys found in the front door of the store. Also, he confirmed that the gun was recovered approximately 20 feet from Jones' body. Henderson did not know whether fingerprint analysis conducted on the gun implicated Jones.

¶ 17    Robert Lohman testified that he is a sergeant with the Chicago police. On January 17, 2006, just before 10 p.m., he received a call concerning a robbery in progress at Diversey and

Central. The officers wanted to set up a perimeter around the store, so he proceeded to a side door where he saw at least six other officers. The officers positioned themselves at each door of the store in case any offenders attempted to escape. As they waited, they heard people shouting, "police, put the gun down" and then they heard gunshots. Within seconds, the side door opened and Lohman saw Woods behind the door carrying a canvas bag. He said, "oh, shit," dropped the bag, and ran back into the store. Officers immediately followed Woods into the store, where they took him into custody. They spotted another individual about five feet from Woods and also took him into custody.

¶ 18    On cross-examination, Lohman stated that when he spoke to a detective about the events of January 17, 2006, he did not mention anything about the officers shouting "drop the gun." Lohman did not give the detective that information because the detective did not ask him that question. Lohman also did not recall whether he told the detective he actually saw Woods drop the canvas bag at the door or say "oh shit" or run back into the store. Lohman stated that when he saw Woods, he was wearing a scarf around his neck.

¶ 19    At the close of the State's case, Woods' counsel made a motion for a directed finding. He argued that the officers "overreacted, used excessive force *** and their actions serve to sever the chain of events that Mr. Woods may have set in motion with the others during the course of the robbery." The trial court then noted that from defense counsel's opening remarks, it appeared he was arguing that Woods may be guilty of armed robbery but not of murder. The court asked Woods whether he discussed this theory with his lawyer and whether he approved of such a defense. Woods answered, "Yes, sir." The trial court denied defense counsel's motion.

¶ 20    Officers Daniel McNamara and Matthew Scott testified for the defense. They received a call about a robbery in progress and positioned themselves about 30 to 40 feet from the officers monitoring the front door of the store. McNamara observed someone come to the front door and unlock the door. He could not see whether the person had anything in his hands. As the front door opened, McNamara heard shouts of "Police" then saw the man at the door raise his arm at two of the officers. He could not tell whether the man had anything in his hand. McNamara then heard gunfire. Scott testified that he could not see anything before the shooting, but he did hear people shouting, "Police."

¶ 21    The jury found Woods guilty of armed robbery of Pizano and Matos, and guilty of first degree murder based on a felony murder charge. The court sentenced him to two concurrent 20-year terms of imprisonment. Woods requested a new attorney and filed a motion for a new trial arguing his trial counsel was ineffective. At the hearing on the motion, his trial counsel, Mr. Miraglia, stated that Woods wanted to present the affirmative defense of withdrawal from the armed robbery. Miraglia, however, persuaded him to go with his theory, which consisted in part of jury nullification. Miraglia understood that jury nullification was not the law in Illinois. However, he thought his argument that it would be unfair to convict Woods under the facts presented was a reasonable one. Also, Miraglia did not present the defense of withdrawal because he did not want Woods to have to testify. The State had indicated that if Woods testified, it would introduce his videotaped statement contradicting his testimony in support of withdrawal. The trial court denied Woods' motion for a new trial and he filed this timely appeal.

¶ 23    In opening remarks, defense counsel stated that "Michael Woods is attempting, has attempted, and will continue to attempt to take responsibility for that for which he is responsible for: Armed robbery. He didn't kill anybody. He certainly didn't expect the result that occurred, specifically Cleon Jones being shot by the police officers." Woods contends that his convictions for first degree murder and armed robbery must be reversed because he was denied his sixth amendment right to effective assistance of counsel. Specifically, Woods argues that his trial counsel provided ineffective assistance *per se* when he conceded Woods' guilt of armed robbery in opening statements which, in essence, also constituted a concession of guilt for felony murder.

¶ 24    In order to prevail on an ineffective assistance of counsel claim, Woods must show that (1) his counsel's performance was deficient so as to fall below an objective standard of reasonableness; and (2) the deficient performance prejudiced him so as to deny him a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To demonstrate sufficient prejudice under the second prong, Woods must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶ 25    In certain situations where defense counsel has conceded guilt, prejudice may be presumed if counsel entirely fails to subject the State's case to meaningful adversarial testing. See *People v. Hattery*, 109 Ill. 2d 449, 464-65 (1985); *United States v. Cronic*, 466 U.S. 648 (1984). In *Hattery*, defendant's counsel unequivocally conceded his guilt of murder, the only charge against him, and informed the jury that the sole question before it was to determine whether to impose the death penalty on defendant. *Hattery*, 109 Ill. 2d at 458-59. During trial, counsel put forth no theory of defense, nor did they present any evidence or make a closing statement. *Id.* at 459. Furthermore, the strategy conflicted with the defendant's plea of not guilty and there was no evidence in the record that he agreed to such a strategy. *Id.* at 464. The supreme court found that in such a situation, prejudice to the defendant may be presumed. *Id.* at 465.

¶ 26    In *People v. Johnson*, 128 Ill. 2d 253, 269 (1989), the supreme court cautioned against reading its holding in *Hattery* broadly and recommended instead that *Hattery* be narrowly construed. Therefore, it is not "*per se* ineffectiveness whenever the defense attorney concedes his client's guilt to offenses in which there is overwhelming evidence of that guilt but fails to show on the record consent by defendant." *Johnson*, 128 Ill. 2d at 269. Rather, defendant "faces a high burden" of demonstrating his counsel's complete failure to subject the State's case to meaningful adversarial testing "before he can forsake the two-part *Strickland* test." *Id.* at 269-70.

¶ 27    Even if trial counsel had conceded defendant's guilt of the offense upon which the felony murder charge is based, ineffectiveness will not be presumed. In *People v. Shatner*, 174 Ill. 2d 133, 143-44 (1996), the defendant argued that by conceding his guilt in a robbery during which the victim was killed, his trial counsel also admitted his guilt for felony murder and therefore provided ineffective assistance. He further argued that because his counsel completely failed to subject the State's case to meaningful adversarial testing, ineffective

assistance can be presumed. *Shatner*, 174 Ill. 2d at 144. Our supreme court disagreed, noting that unlike counsel in *Hattery*, the defendant's counsel served as his advocate during the course of the proceedings. *Id.* at 145. His counsel presented opening and closing arguments, cross-examined almost all of the State's witnesses, presented witnesses for the defense, made objections and moved for a mistrial. *Id.* at 145-46. The court rejected the defendant's argument that his counsel entirely failed to test the State's case such that ineffectiveness can be presumed. *Id.* at 146.

¶ 28    The *Shatner* court then applied *Strickland* to determine whether defense counsel was ineffective. It reiterated the general rule "that ineffective assistance-of-counsel claims must be viewed under the totality of the circumstances of each individual case." *Id.* at 147. Although counsel in *Shatner* conceded defendant's guilt of robbery, his strategy was to convince the jury that defendant's minimal participation in the crime justified, at the most, a conviction for only robbery. Toward that end, counsel cross-examined almost all of the State's witnesses and called several witness on behalf of defendant in order to question the credibility of the State's witnesses. The court acknowledged that the strategy was a risky one, but given defendant's incriminating statements and the overwhelming evidence of his guilt, it may have been the only strategy available. Therefore, counsel's utilization of the strategy did not constitute deficient performance. *Shatner*, 174 Ill. 2d at 147-48.

¶ 29    Here, although trial counsel conceded Woods' guilt of armed robbery, he acted as Woods' advocate throughout the trial proceedings. Counsel developed a theory of the defense in opening and closing arguments. He cross-examined the State's witnesses, presented witnesses on behalf of Woods, and moved for a directed finding. Counsel did not completely fail to subject the State's case to meaningful adversarial testing. Consequently, the holdings in *Hattery* and *Cronic* do not apply. Further, we cannot presume that counsel was ineffective and we must apply the *Strickland* test to determine whether counsel's performance was deficient. See *Shatner*, 174 Ill. 2d at 146.

¶ 30    The evidence against Woods at trial was overwhelming. All three employees of the Auto Zone testified that three men entered the store shortly before 10 p.m., and one of them wore a scarf around his face. Pizano and Laluz testified that the man with the scarf had a gun and the other offenders wore masks. The employees were ordered to go to the back office and the men tied them up with spark plug wires and emptied their pockets. The men also broke into the inner safe located in the office. Laluz testified that one man went to the front door and after shots were fired, the other men ran to the emergency doors in the back. The police, who had formed a perimeter around the store to prevent escape, observed Woods coming out of the side door. He was wearing a scarf around his neck. Woods dropped a bag he was holding, said "Oh, shit," and went back into the store. Officers followed him into the store and subsequently took him into custody. Jones, who had tried to leave through the front door, was shot and killed by police who believed he had pointed a gun at them. A gun was found approximately 20 feet from Jones' body.

¶ 31    A person who commits a felony is liable for deaths that are the direct and foreseeable consequence of his actions. *People v. Lowery*, 178 Ill. 2d 462, 467 (1997). The forseeability component ensures that "even when cause in fact is established, it must be determined that any variation between the result intended *** and the result actually achieved is not so

extraordinary that it would be unfair to hold the defendant responsible for the actual result." 1 Wayne R. LaFave, Substantive Criminal Law § 6.4, at 464 (2d ed. 2003). Therefore, one is responsible for the death of a cofelon shot by police if "the officers' resistance was in direct response to the attempted armed robbery set in motion by defendant and did not break the causal chain between defendant's acts and [the cofelon's] death." *People v. Burnom*, 338 Ill. App. 3d 495, 507 (2003).

¶ 32     Given the evidence against Woods, his counsel developed a strategy in which he conceded Woods' guilt of armed robbery but argued that the shooting was not foreseeable because the police acted irrationally. Counsel cross-examined Pizano and Laluz, whose testimony contradicted that of other State witnesses on whether the officers shouted "police" or "drop the gun" before firing at Jones. He presented Officers McNamara and Scott as defense witnesses, and they testified that they did not see whether Jones had anything in his hand before police shot at him. Pizano and Laluz also stated that they did not recall seeing Jones with a gun. Counsel argued that Jones was not armed and focused on the fact that police fired an excessive 41 rounds at Jones. It would be unfair, he argued, to hold Woods responsible for the death of Jones because the shooting resulted from unforeseeable police misconduct which broke the causal connection between the armed robbery and Jones' death.

¶ 33     Given the law of felony murder, this appeal to the jury's sense of justice had no legal basis as a defense. However, courts have determined that counsel's reliance on such arguments does not necessarily constitute ineffective assistance. See *People v. Nieves*, 192 Ill. 2d 487, 499 (2000) (argument that the sudden and intense passion element of second degree murder "could be viewed in terms of sympathy and the desire to help a friend" who wanted to die was a "dubious proposition at best"); *People v. Ganus*, 148 Ill. 2d 466, 473-74 (1992) (compulsion defense to murder not a legal defense); *People v. Bloomingburg*, 346 Ill. App. 3d 308, 316 (2004) (counsel presented theory of self-defense which was unavailable because the defendant was the aggressor and did not face imminent danger of great bodily harm or death). In each case, the court found that counsel's performance was not deficient given the overwhelming evidence against the defendant, and the defendant's insistence on pleading not guilty despite the evidence.

¶ 34     Woods elected to go to trial on the armed robbery and felony murder charges, and the evidence against him was overwhelming. His counsel admitted that his strategy, in part, was to argue jury nullification by appealing to the jurors' sympathy and sense of fairness. "[I]t is not necessarily *per se* ineffective assistance for a defense attorney to advance a nonlegal defense, such as a plea for jury nullification *** when the circumstances of the case render other defensive strategies unavailable." *People v. Morris*, 209 Ill. 2d 137, 183 (2004), *overruled on other grounds by People v. Pitman*, 211 Ill. 2d 502 (2004). Although counsel may not argue that jurors should ignore the law in coming to a decision, he may present a defense evoking the "empathy, compassion or understanding and sympathy" of the jurors. *Ganus*, 148 Ill. 2d at 473-74. As the court in *Ganus* stated, "[j]ury nullification is always a possibility" when counsel attempts such arguments. *Id*. Furthermore, defense counsel may have attempted to preserve his credibility in the eyes of the jury by conceding guilt of armed robbery in light of the overwhelming evidence against Woods. "[W]here there is overwhelming evidence of guilt and no defense, if counsel contests all charges he is liable

-8-

to lose credibility with the trier of fact" with regard to the entire case. *Johnson*, 128 Ill. 2d at 270. Under the circumstances here, we do not find counsel's performance deficient with respect to his theory of the defense.

¶ 35 Woods contends that his counsel's actions constituted *per se* ineffective assistance under *Hattery* and disagrees that *Nieves, Ganus,* and *Bloomingburg* are applicable here. He contends that the overwhelming evidence presented at trial in those cases included a statement by the defendant, while here the State did not present any statement of Woods' involvement in the robbery. However, *Nieves, Ganus*, and *Bloomingburg* do not hold that evidence against a defendant is considered overwhelming only if it includes a statement by him. Instead, the supreme court also referred to other evidence of defendant's participation contained in the record when it found the evidence against him overwhelming. *Ganus*, 148 Ill. 2d at 473; *Bloomingburg*, 346 Ill. App. 3d at 321. See also *People v. Milton*, 354 Ill. App. 3d 283, 289-90 (2004) (defendant did not give a statement and counsel's proffering of "implausible defense theory" of attempt possession of narcotics was not deficient performance where "no other [defense] was available"). The evidence here was overwhelming and contained little on which Woods' counsel could build a solid theory of innocence. "A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense." *Ganus*, 148 Ill. 2d at 474.

¶ 36 Woods also cites *People v. Woods*, 151 Ill. App. 3d 687 (1986), to support his contention that his counsel's assistance was ineffective *per se*. In *Woods*, the defendants were charged with theft and burglary. The court found that counsel's concessions that the defendants committed theft "during his closing statement nullified defendants' rights to have the issue of their guilt or innocence on each charge presented to the jury as an adversarial issue and consequently resulted in counsel's total failure to subject the prosecution's case to meaningful adversarial testing." *Woods*, 151 Ill. App. 3d at 694. The defendants in *Woods*, however, consistently maintained that they had no knowledge of the theft and even testified that they were not involved in the theft. *Id.* at 692. The court found that counsel's concession completely contradicted the defendants' theory of innocence and repudiated their positions taken "from the opening statement throughout the trial." *Id.* at 693. Unlike the *Woods* defendants, our Woods never explicitly stated that he was innocent of the armed robbery, nor did he testify at trial as to his innocence. The *Woods* case, therefore, is inapposite and does not apply here.

¶ 37 Woods also argues that, despite the record indicating he agreed with his counsel's strategy, he never fully understood it and thus could not knowingly give his consent to the strategy. Woods cites *Morris* as support. In *Morris*, however, the defendant indicated he had "no problem" with the strategy but his consent was based on his attorney's misapprehension of the court's ruling. *Morris*, 209 Ill. 2d at 185. Furthermore, *Morris* "contain[ed] an unusual convergence of errors that [brought] it within the holding of *Hattery*." *Id.* at 187. Consent, therefore, is a factor in determining whether counsel's complete failure to provide any meaningful adversarial testing of the State's case is *per se* ineffectiveness under *Hattery*. Woods' case does not meet the requirements of *Hattery* and there is no evidence that his consent was based upon his counsel's misunderstanding of a court ruling. *Morris* has no application here.

¶ 38    Furthermore, Woods has not proven sufficient prejudice under the second prong of *Strickland*. To prove prejudice, Woods must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Woods argues that he suggested pursuing a theory of withdrawal. However, he does not explain how he would have prevailed on that theory. He only states that " it is not entirely clear from the record what evidence of withdrawal was available." Woods' trial counsel did acknowledge that he did not present the defense of withdrawal because he did not want Woods to testify. The State had indicated that if Woods did testify, it would introduce his videotaped statement contradicting his testimony in support of withdrawal. Woods also suggests that "presenting no specific defense, and simply holding the State to prove its case beyond a reasonable doubt would have been more reasonable than the approach taken." Given the overwhelming evidence against him, however, such a strategy most likely would not have resulted in a different outcome. Since Woods has not adequately shown how he was prejudiced by his counsel's performance, he cannot prevail on his ineffective assistance claim. See *People v. Graham*, 206 Ill. 2d 465, 476 (2003) (court may dispose of an ineffective assistance of counsel claim if the defendant fails to show he suffered sufficient prejudice).

¶ 39    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 40    Affirmed.